**FEDERAL DEPOSIT INSURANCE CORP.**

Jeffrey A. Sandell, Arizona State Bar No. 020658
E-mail: jsandell@fdic.gov
Bob J. Rogers, Texas State Bar No. 17163400
Email: brogers@fdic.gov
1601 Bryan St., 15th Floor
Dallas, TX 75201
972.761.2280 Telephone
972.761.8181 Facsimile

**MULLIN HOARD & BROWN, LLP**

John M. Brown, Texas State Bar No. 03142500
Email: jmb@mhba.com
Anthony W. Kirkwood, Texas State Bar No. 24032508
Email: tkirkwood@mhba.com
500 S. Taylor, Suite 800
Amarillo, Texas 79101
(806) 372-5050 Telephone
(806) 372-5086 Facsimile

Attorneys for Federal Deposit Insurance Corporation,
as Receiver for First National Bank of Nevada

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR FIRST NATIONAL BANK OF NEVADA, | Case No. _____ |
| Plaintiff, | |
| v. | COMPLAINT FOR DAMAGES FOR BREACH OF FIDUCIARY DUTIES, NEGLIGENCE AND GROSS NEGLIGENCE |
| GARY A. DORRIS, an individual; and PHILIP A. LAMB, an individual, | |
| Defendants. | DEMAND FOR JURY TRIAL |

**COMPLAINT FOR DAMAGES**

Plaintiff, the Federal Deposit Insurance Corporation, as Receiver for First National Bank of Nevada ("FDIC"), alleges as follows:

## I.    INTRODUCTION

1.    This case is a suit against two former directors and officers, including the President and Chief Executive Officer (collectively "directors and officers"), of First National Bank of Arizona ("FNB Arizona"). The FDIC seeks to recover in excess of $193 million in damages resulting from the directors' and officers' breaches of fiduciary duties, negligence and gross negligence.

2.    The claims against the directors and officers are based on their creation of a Wholesale Mortgage Division within FNB Arizona. The Wholesale Mortgage Division was formed for the express purpose of purchasing and marketing billions of dollars of non-traditional single family residence mortgage loans commonly referred to as "Alt-A loans."

3.    FNB Arizona sacrificed safety and soundness in favor of specializing in non-traditional loans characterized by a lack of proper underwriting, no verification of income or assets, and terms that guaranteed high default rates in the future.

4.    Although these risky loans returned record profits in the near term, they produced losses once the real estate market softened, and ultimately caused the bank's failure. The directors and officers promoted this practice at the outset and continued to support the mortgage division's growth long after they should have known that the loans being made created a substantial risk of harm to the bank.

5.    FNB Arizona was one of three banks owned by First National Bank Holding Company ("FNB Holding"), its sister banks being First National Bank of Nevada ("FNB Nevada") and First Heritage Bank

("First Heritage"). FNB Arizona was merged into FNB Nevada on June 30, 2008, less than a month before the Office of the Comptroller of Currency ("OCC") closed FNB Nevada at an estimated loss to the insurance fund of nearly $900 million.[1]

6.     The directors and officers sued here not only held positions as board members and officers of FNB Arizona, but in most cases were also board members or executive officers of the related banking entities.

## II.     JURISDICTION AND VENUE

7.     On July 25, 2008, FNB Nevada, a federally chartered national bank with its principal place of business in Scottsdale, Arizona, was closed by the OCC and the FDIC was appointed as receiver. Pursuant to 12 U.S.C. § 1821(d)(2), the FDIC is the successor to all claims originally held by FNB Nevada and of any stockholder, member, accountholder, depositor, officer, or director of FNB Nevada with respect to the institution and the assets of the institution, including the right to bring this action for breach of fiduciary duty, negligence and gross negligence against certain former officers and directors of FNB Nevada and FNB Arizona.

8.     This action arises under the laws of the United States of America, specifically including 12 U.S.C. §1821(d)(2) and (k) and 12 U.S.C. §1819(b).

9.     This Court has personal jurisdiction over the defendants because either (i) the defendants are residents of Arizona, and/or (ii) the acts and omissions by the defendants complained of in this complaint

---

[1] First Heritage met a similar fate, and FNB Holding, which suffered a first quarter loss in 2008 of well in excess of $100 million, was subject to a cease and desist order from the Board of Governors of the Federal Reserve System.

**COMPLAINT FOR DAMAGES**

occurred in Arizona.

10.    Venue is proper in this judicial district under 28 U.S.C. §1391(b) because all or a substantial part of the events and omissions giving rise to the claims occurred in this judicial district, and the defendants reside in such district.

## III.    PARTIES

11.    **Plaintiff:** The FDIC is acting in its capacity as Receiver for FNB Nevada and as the successor to all claims originally held by FNB Nevada and of any stockholders, members, accountholders, depositors, officers, or directors of FNB Nevada with respect to the institution and the assets of the institution, and as such is authorized to sue pursuant to 12 U.S.C. § 1821(d)(2) and (k).

12.    **Defendant Gary A. Dorris:**    The FDIC is informed and believes, and on that basis alleges, that defendant Gary A. Dorris ("Dorris") is an individual residing in Scottsdale, Arizona.  Dorris was President, Chief Executive Officer ("CEO"), and Vice Chairman of the Board of FNB Holding, FNB Arizona, and FNB Nevada.  He was also Vice Chairman of First Heritage.  Dorris served at FNB Arizona from its beginning on February 1, 2001 until he resigned on May 13, 2008.  He held $1/10^{th}$ of one share in FNB Holding.

13.    **Defendant Philip A. Lamb:**  The FDIC is informed and believes, and on that basis alleges, that defendant Philip A. Lamb ("Philip Lamb") is an individual residing in Scottsdale, Arizona. Philip Lamb was an EVP and a director of FNB Holding, FNB Arizona, and FNB Nevada throughout their existence.  He owned 4.96 percent of FNB Holding's shares.

**COMPLAINT FOR DAMAGES**

## IV.    FACTUAL BACKGROUND

14.    The FDIC is suing two former directors and officers of FNB Nevada and FNB Arizona for losses arising out of FNB Arizona's negligent and grossly negligent management.

15.    The FDIC's claims against the directors and officers are based on losses resulting from the unsustainable business model they promoted for FNB Arizona's loan portfolio--a model that depended on real estate values rising indefinitely and low default rates. The first of which has never before happened and the second of which was impossible given the nature of the risky loans the bank promoted. Furthermore, the directors and officers continued to follow this model long after they knew of the substantial risk of harm to the bank posed by this business model. Notably, the directors and officers had previously sued former mortgage division officers for following the same business model the defendants continued promoting.

16.    Although FNB Arizona wrote and packaged loans for sale in the secondary market and did not intend to hold the loans, the risk of loss nevertheless always rested with the bank. Since FNB Arizona had no binding purchase commitments from secondary market investors, the bank would be "stuck" with any loan an investor refused to buy. When the residential real estate market collapsed and default rates skyrocketed, FNB Arizona was left holding millions of dollars of bad loans it could not sell.

### A. The Banks are Formed

17.    FNB Holding was formed on September 24, 1997, as a Nevada corporation.  In September of 1998, FNB Holding purchased

Laughlin National Bank (Cert# 27011) and changed its name to First National Bank of Nevada. In September 1999, FNB Holding opened First Bank of Arizona under a new certificate number (Cert #35222).

18. In January 2001, FNB Holding acquired Rocky Mountain Bank (Cert# 27508) and changed its name to First National Bank of Arizona. On January 31, 2001, FNB Arizona's institution class was changed to Insured Commercial Bank, National Member.[2]

19. In June 2001, First Bank of Arizona (Cert# 35222) was merged into FNB Arizona (Cert# 27508) and continued operation as FNB Arizona (Cert# 27508).[3] At the same time FNB Arizona's headquarters were moved from Chandler, Arizona to Scottsdale, Arizona. On September 20, 2004, FNB Holding registered as a foreign corporation in Arizona. FNB Holding chartered a new bank in Newport Beach, California on February 15, 2005, which operated as First Heritage Bank (Cert# 57961).

## B. The Directors and Officers' Vision for the Bank and its Growth in the Alt-A Markets

20. FNB Arizona was relatively conservative until the early 2000's, when it began venturing into the purchase of high risk and low quality mortgage loans for resale. As loan volume skyrocketed, the Wholesale Mortgage Division was created.

21. The Wholesale Mortgage Division was extremely aggressive and performed research in geographic markets in order to develop

---

[2] At the same time the bank's primary regulatory agency was changed from the Federal Deposit Insurance Corporation to the Office of the Comptroller of the Currency.

[3] Formerly Rocky Mountain Bank.

mortgage products that would beat the competition in those targeted markets. These products came in a variety of forms, but all involved high risk. Thus, FNB Arizona began offering a variety of non-traditional single family residence mortgage loans, including, among others, no documentation loans, no ratio loans, and option ARM loans. FNB Arizona also offered subprime loans.

22.     The Wholesale Mortgage Division also improperly delegated its duty to determine appropriate loan underwriting standards. It underwrote its loans to standards provided by potential investors rather than relying on the Bank's own analysis of credit risks--risks the directors and officers were well aware of. These loans were destined to failure because they were not based on safety and soundness standards, such as an evaluation of borrower's ability to repay the loans or the value of the collateral to support the credit. And even though the loans were being packaged for resale to investors, the directors and officers took no action to ensure that the loans could be resold before they were purchased. Instead, the bank relied on investors' expression of interest in purchasing more loans, without requiring any purchase commitments.

23.     As a result, FNB Arizona originated relatively few conventional fixed rate home mortgage loans and was instead known for offering high risk, non-traditional, Alt-A loans. In fact, the bank billed itself as "The Home of Alt-A Lending." *See* Ex. A. Because of its lending strategy, FNB Arizona's loan portfolio consisted in large part of (a) high risk loans, including no documentation, no ratio, and option ARM loans, (b) many made with no verification of borrowers' stated income or assets, and (c) the majority of which were originated by brokers. Each of these factors alone is a well-known and significant credit risk that greatly

**COMPLAINT FOR DAMAGES**

increased the Bank's long term exposure to losses. But FNB Arizona compounded the problem by making loans with multiple risks--so called layered risk loans--which increased the risk of loss exponentially, and then sealed its fate through lax underwriting. In addition, in order to make these loans more attractive to investors, FNB Arizona began assuming increasingly more relaxed repurchase obligations, thus bearing these risks directly.

24.     In 2006, the Wholesale Mortgage Division's residential mortgage lending peaked at $7.2 billion. Instead of following a prudent policy of diversification, the directors and officers allowed FNB Arizona to invest in excess of 85% of its residential mortgage loans in these risky Alt-A loans.

## C. The Risks that were Ignored

25.     FNB Arizona offered a wide variety of sub-standard loan products, not all of which are listed here, and increased the risks further through its reliance on brokers and lax underwriting.

### (a) Alt-A Loans

26.     FNB Arizona's portfolio primarily consisted of Alt-A loans. An Alt-A loan or mortgage, short for Alternative A-paper, is a type of U.S. mortgage that has substantially greater credit risk than A-paper, or "prime paper," but somewhat less risk than "subprime paper," the riskiest category. Alt-A interest rates, which are determined by credit risk, tend to be between those of prime and subprime loans. The hallmarks of Alt-A lending are limited documentation and verification of a borrower's ability to repay. Alt-A borrowers at FNB Arizona were excused from providing income verification or documentation of assets. Instead, approval of an

**COMPLAINT FOR DAMAGES**

Alt-A loan was based primarily on an individual's credit (FICO) score. The loans the Wholesale Mortgage Division was promoting clearly did not meet safety and soundness standards because of, for example, the lack of minimal income and asset verification requirements. Coupled with the layering of other risks, such as no or reduced documentation and other loan underwriting issues, these loans were destined to default should the investors decide not to purchase them.

### (b) No Documentation and Stated Income Loans-- "Liar Loans."

27.     FNB Arizona offered borrowers no documentation and stated income loans. These loans were based solely on the borrower's *stated* income with no documentation required. The obvious risk of not verifying income was that borrowers frequently overstated their income to qualify for a loan, a problem well known in the banking community. For this reason, reduced documentation loans were known as "liar loans." Yet the only protection FNB Arizona had on these loans was a "smell-test." For example, if a person stated that their income was $250,000 the underwriter would look at the borrower's occupation. If it was a doctor or lawyer, the loan likely would proceed. If it was a gardener, further investigation *may* have occurred.

### (c) Negatively Amortizing Option ARM Loans

28.     FNB Arizona also offered negatively amortizing option ARM loans. As a general rule, these loans gave borrowers a variety of payment options, some of which resulted in increasing loan balances because the payments made in the early terms of the loans were less than the accrued interest. Thus, refinancing is generally only possible if property values continue to rise. Should property values fall the loan to

**COMPLAINT FOR DAMAGES**

value ratio would be negatively affected, complicating or making refinancing impossible. In addition, because the borrower is on an adjustable rate mortgage, and the initial payment structure results in increasing loan balances, at some point the payments would have to increase dramatically to begin reducing principal--something many borrowers could not afford. The directors and officers ignored this fundamental risk.

### (d) The Added Credit Risk Created by a Lack of Underwriting

29.   Given the risks inherent in these loans, a rigorous underwriting function was required. The bank's loan operations and guiding principles, however, were not structured to encourage its underwriters to reject overly risky loans. Instead, the directors and officers promoted a different goal for the Wholesale Mortgage Division: to grow the bank as much as possible.

30.   Furthermore, employee compensation was linked to volume, causing a inherent conflict of interest between stability and rational risk and the aggressive promotion of risky products. The bank's compensation package encouraged employees to approve loans in order to meet personal financial goals rather than to enforce compliance with sound underwriting principles.

31.   The success of the bank's wholesale mortgage operation was tied entirely to an ever increasing real estate market. As had historically been the case, as real estate values increased home equity increased, enabling borrowers to "grow" into loans they could not initially afford. That is, by the time "teaser" interest rates on ARM loans terminated and substantially higher interest rates phased in or the payments on negatively

COMPLAINT FOR DAMAGES

amortizing loans were readjusted, borrowers could use this increased home equity to support refinancing into a conventional mortgage. This business strategy works only so long as real estate values continue to rise. But when the real estate bubble burst--as it did in 2005--this once highly profitably strategy became the bank's worst nightmare

32.     The directors and officers were aware that the viability of FNB Arizona's wholesale mortgage business strategy depended entirely on an appreciating real estate market and of the risks such a strategy posed to the bank. Yet they did nothing to change or diversify the bank's basic business strategy of aggressively expanding its loan portfolio with poorly underwritten high risk loans. When the real estate market crashed, the bank was left holding hundreds of millions of dollars of loans it never would have made for its own account. Ultimately, the majority of FNB Arizona's loans did not involve any verification of income, any verification of assets, or any investigation of a person's willingness and ability to repay their loans.

### (e) The Added Credit Risk Created by Use of Mortgage Brokers

33.     A substantial portion of FNB Arizona's loans were originated through mortgage loan brokers. FNB Arizona sent employees to various geographic areas in order to investigate the loan markets in that area and offer products and terms to brokers that were more favorable than those offered by FNB Arizona's competitors. FNB Arizona had few controls over the brokers themselves or the quality of their work. Instead, the brokers were encouraged to sell as many loans as possible, and were rewarded on that basis.

**COMPLAINT FOR DAMAGES**

34.   By accepting a high volume of broker-originated loans, FNB Arizona lost control over much of the loan application and appraisal process. Because brokers have a financial incentive to originate as many loans as possible, tend to be knowledgeable about bank automated underwriting systems, and often have continuing relationships with loan originators and appraisers, they are able to help borrowers craft loan applications to obtain loans that would not normally be approved if underwritten to sound banking principles. This practice commonly leads to loan application income and value overstatements. Instead of taking steps to curb these risks, the directors and officers condoned this activity.

### (f)  Layering of Risks

35.   The risks created by reduced documentation loans, broker origination, Alt-A and option ARM loans, subprime loans, and the failure to apply safe and sound underwriting standards had a multiplying effect when combined. Many of the bank's loans had not just one, but multiple risks. Diligent underwriting--including verifying borrower income, assets, and repayment capacity--would have mitigated these risks. But the directors and officers did not require it.

36.   The directors and officers should have known that FNB Arizona's large concentration of high risk loans would lead the bank to failure when real estate prices stopped rising and borrowers could no longer refinance their loans at will. They also should have known that loans made without any proof of borrower income, assets, and ability to repay are nothing more than loans made without any evidence that the borrowers could ever perform.

37.   But high risk loans were popular with borrowers during these periods, and the directors and officers wanted increased market share.

**COMPLAINT FOR DAMAGES**

Thus, the directors and officers did not enforce any concentration limits for FNB Arizona's residential lending portfolio and, as a result, high risk loans grew exponentially to over 85% of the bank's residential mortgage portfolio.

### (g) The Bank Fails to Follow its Own Alt-A Lending Policies

38.     FNB Arizona established lending policies to govern its production of Alt-A loans.  These policies included the Alt-A General Underwriting Guidelines, the Mortgage Policy Manual, and the Alt-A Underwriting Philosophy.  It was the duty of FNB Arizona's directors to establish, approve and ensure the bank's adherence to lending policies designed to protect the safety and soundness of the bank.  FNB Arizona's board of directors breached its fiduciary duties by allowing the Wholesale Mortgage Division to disregard the bank's approved and established Alt-A lending policies.

39.     FNB Arizona's Alt-A lending policies included underwriting requirements premised on safety and soundness standards.  For example, the Alt-A General Underwriting Guidelines required the underwriter to ascertain that the borrower had both the ability and the willingness to repay the loan according to its terms.  In addition, the Alt-A Underwriting Philosophy prohibited the use of stated income or stated income/stated asset loans "to mislead or falsely represent the borrower's ability to repay the mortgage debt."

40.     The Wholesale Mortgage Division did not, however, apply its own safety and soundness underwriting standards to loans it intended to sell in the secondary market.  Rather, the bank used standards set by the investors who were purchasing the bank's Alt-A loans in the secondary

**COMPLAINT FOR DAMAGES**

market. In effect, the directors and officers improperly delegated their duty to set prudent lending standards to the secondary market place.[4]

41.    As a result, FNB Arizona applied the lax investor standards rather than traditional safety and soundness standards when underwriting its Alt-A loans. In contrast, when the bank was originating a conventional mortgage loan it intended to keep as an investment, the bank applied the traditional safety and soundness underwriting standards to that loan. To mitigate the inherent risk in its investor guided Alt-A lending program, the bank adopted a policy of quickly selling all of its Alt-A loans in the secondary securitization market. By adopting this policy, the directors and officers highlighted their awareness of the risk of substantial harm to the bank if the bank was forced to retain these poorly underwritten Alt-A loans in its own investment portfolio.

42.    The directors and officers had a nondelegable duty to establish prudent lending standards, based on the principles of safety and soundness applicable to national banks, to all of its lending operations, not just those loans the bank intended to keep in its own portfolio. By effectively delegating the obligation to set underwriting standards for the bank's Alt-A loans to the investors, the directors and officers breached that duty. Moreover, the directors and officers permitted the Wholesale Mortgage Division to expand its Alt-A lending concentration to the point where in excess of 85% of the bank's residential mortgage loans were non-traditional Alt-A loans which were not underwritten to safety and

---

[4] FNB Arizona sold its Alt-A loans to investment banks and specialty finance entities who securitized the loans and sold securities to ultimate investors. These securities produced high yields because of the increased risk of loss inherent in Alt-A loans. The underwriting standards set by the investment brokers were substantially more lax than traditional safety and soundness underwriting standards.

**COMPLAINT FOR DAMAGES**

soundness standards.  The directors and officers' failure to ensure the bank's adherence to its own established Alt-A lending policies constituted grossly negligent conduct.

### (h) The Market Turns

43.    Between 2002 and early 2005, the residential real estate mortgage market had grown nationally due to relatively low interest rates, a demand for Alt-A loans, and the investment banks' appetite for such loans to fuel their residential mortgage-backed securitizations. After mid-2005, with rising interest rates and increased competition, the Wholesale Mortgage Division became increasingly less profitable and the secondary market for Alt-A mortgages slowed substantially in 2006, and then ceased altogether in 2007.

### (i) The Directors and Officers Ignored Repeated Warnings Regarding Risks Inherent in the Wholesale Mortgage Division

44.    During the mid-2005 timeframe, the directors and officers were warned by senior bank employees that the bank would need to either (a) sell the Wholesale Mortgage Division or (b) diversify their products to adopt a more conservative approach.

45.    The OCC also warned the directors and officers of its concerns regarding rapid loan growth, underwriting issues, a lack of corporate governance, and the bank's production oriented compensation system. The OCC cautioned the directors and officers of the challenging environment FNB Arizona faced in 2005, and that the continued sale of Alt-A mortgages had a significant influence on what would otherwise be a conservative level of risk in bank operations. The OCC went so far as to cast doubt on the viability of the Wholesale Mortgage Division's business

**COMPLAINT FOR DAMAGES**

model.

46.     In fact, these warnings began as early as 2003. In its October 6, 2003 Report of Examination ("RoE"), the OCC warned the directors and officers of high credit risks due, in part, to rapid loan growth and continued expansion into new markets. Then, in its September 20, 2004 RoE, the OCC warned the directors and officers about increased risks from "systemic changes in the market for the Bank's niche mortgage product," Alt-A loans. The OCC also cautioned that the Bank's corporate governance was "minimally satisfactory," strongly encouraged the Bank to add outside directors with banking or financial expertise, and warned that the "existing compensation system [for loan officers] is entirely production oriented."

47.     The OCC even warned of price risks due to narrowing spreads for the Bank's niche mortgage products and a lack of correlated hedging instruments, as well as increasing risk because "the mortgage division is faced with a more challenging environment for their Alt-A products." As noted in the sensitivity to market risk section of this report, "[m]oderate market risk associated with the secondary marketing of Alt-A mortgages continues to influence an otherwise low level of sensitivity of interest rate changes in traditional bank operations. . . . we identified inconsistencies in the correlation analysis performed within PowerSeller for Alt-A mortgages. These inconsistencies could materially alter hedging results and the stated risk position of mortgage operations. . . . [i]t is incumbent upon management to improve the analysis of the relationship between mortgages and hedges within PowerSeller to more accurately measure the risk position of mortgage operations."

48.     In fact, on March 15, 2005, the directors and officers

received an internal email stating "that [i]f all of us can't read what is going to happen in the future and learn from the past market corrections and declines, we are doomed to failure. Hopefully, we do not want our First National Bank to be doomed because of the decisions we are making today." *See* Ex. B. The e-mail further stated that "[p]articularly, we do not want to be compromising credit, credit policy or other lending standards that we know are built in for our own protection." *Id.* (emphasis added). But this is exactly what the directors and officers did.

49.    In an August 31, 2005, strategic evaluation review conducted for FNB Holding, the reviewer concluded that part of a five-year strategic plan to maximize the value of the institution should include:

> De-emphasize the mortgage operations due to the headwinds in the mortgage business, including over-extend (sic) home prices in the southwest, excess industry capacity and risks of secondary market dislocations.

*See* Ex. C. The reviewer also observed that FNB Arizona's income was much higher compared to peer commercial banks "due to the large impact of the mortgage company," and concluded that the "large and volatile income of the mortgage company has also created significant volatility in the profitability at FNB." The reviewer also observed that the "challenge to building strong value at FNB is the current reliance on mortgage banking," and concluded his report as follows:

> The outlook for mortgage valuations in the next two years is problematic in our view. First, the overheated housing market, primarily in fast growing regions such as the southwest, is expected to slow and potentially turn negative. Second, the primary growth in the mortgage markets during the last two years have been in unconventional products

including sub-prime and Option ARMs which are likely to have high loss content if housing markets cool. Third, the Federal Reserve has signaled its desire to raise interest rates, tightening monetary policy, which should eventually slow housing and mortgage demand.

*Id.*

50.    Thus, as early as August of 2005 the directors and officers were being warned that (a) the housing market was overheated, particularly in the markets in which FNB Arizona was heavily vested, (b) the unconventional lending products the bank was promoting were likely to have dramatic losses if the expected drop in the housing market occurred, and (c) the FED was tightening monetary policy which will have a dilatory effect on mortgage demand.

51.    The warnings continued. In its September 19, 2005 RoE, the OCC warned that the "mortgage division continues to face a challenging environment including a higher volume of lower profit adjustable rate loans, tight pricing on loan pools, and a product mix that is difficult to hedge." The OCC expressed increasing concern about ongoing losses in the division--with revenue $26 million below budget--and the risks associated with the wholesale mortgage operations explosive growth. The OCC further warned that "the viability of the mortgage division business model is in doubt."

52.    The OCC stressed that the "quality of loan production warrants significant improvement" and noted numerous issues with loans that could not be sold because of documentation lapses, foreclosures, litigation, or title problems. Because of these substantial unknowns, OCC examiners "encourage[d] management to develop contingency plans to

**COMPLAINT FOR DAMAGES**

restructure or exit the [wholesale mortgage] business if warranted."

53.    The OCC also listed actions required in the Wholesale Mortgage Division, including: "(1) Develop and implement procedures, processes and accountability that are effective in reducing the level of underwriting exceptions. Moderate and material exceptions in the underwriting process remain unacceptably high, averaging 15% as of the latest quality control report. These exceptions are of sufficient significance that they could result in loan repurchases; (2) The division's monthly 'risk book' needs to be enhanced. With the expanding product line, risk books do not give adequate perspective on product mix and risk. Each product covers a broad risk spectrum. Interest only and flex-pay products continue to increase. The current risk book is focused on A, Alt-A, and sub-prime mortgage loans; and, (3) Develop contingency strategies to restructure or exit the business if the actions to return to profitability are not successful. The strategies should establish trigger points for reassessing division viability. The triggers should be based on objectives and reasonable performance measures, including profitability targets and timeframes." The directors and officers never addressed these problems and they continued unabated.

54.    The warnings continued in 2006. Although the Bank continued to receive relatively favorable composite CAMELS ratings, "underwriting exceptions remained stubbornly high at FNB Arizona." The OCC advised that the "board and management must ensure that the following significant issues are fully and promptly addressed." These issues included (1) "[d]evelop and implement procedures, processes, and accountabilities that are effective for reducing the level of underwriting exceptions (REPEAT);" (2) "underwriting processes for reduced

documentation loans should demonstrate repayment capacity assessments as required by OCC Bulletin 2006-41;" and (3) the "bank's repurchase reserve analysis needs to be enhanced to take into account the economic environment and other external factors (REPEAT from 2005)." The OCC also noted a widespread layering of risks, many of which would occur within the same loan.

55.    In its October 15, 2007 RoE, the OCC assigned FNB Arizona a composite CAMELS "4" rating as of September 30, 2007. The RoE stated that "[s]ignificant weaknesses in oversight of high-risk mortgage operations became evident with the deterioration of the residential mortgage investor markets in early 2007." The examiners concluded that mortgage division management: (a) was slow to react to deteriorating markets, (b) changed sales agreements creating a highly unfavorable risk/reward relationship, and (c) failed to fully correct high underwriting exception and repayment capacity weaknesses identified in the 2006 RoE. These factors resulted in high levels of loan repurchases, early payment defaults, and losses. The result was that classified assets increased, and the bank's liquidity became tenuously strained.

## V.    SUMMARY OF CLAIMS AGAINST THE DIRECTORS AND OFFICERS

56.    Despite being fully cognizant of the risks attendant to the Wholesale Mortgage Division for many years, the directors and officers continued the operation and growth of the mortgage lending operation. They continued to disregard the risks even after they were told that the division should be sold, that FNB Arizona needed to "right size" rather than continue its dramatic growth, and that the Bank needed to diversify the types of loans offered to provide protection in the long run. These

warnings were all ignored.

57.     Ultimately, the market began to deteriorate.  Rather than impeding growth, the directors' and officers' answer to market deterioration was to further loosen its underwriting standards in the hopes that investors would continue to purchase the bank's high yield/high risk loan products, and sell mortgages at reduced prices in order to attract more investors.  And, the bank provided investors with easier recourse to force the bank to repurchase bad loans, while at the same time amending broker agreements to waive the bank's ability to force brokers to repurchase loans returned by investors.  As a result, the directors and officers allowed FNB Arizona to assume all the downstream risk for its loan products.

58.     The directors and officers ignored repeated warnings regarding the need for stronger controls over the origination of high-risk non-traditional Alt-A loans, and ultimately found the bank repurchasing hundreds of millions of dollars in loans.   In fact, FNB Arizona repurchased approximately $314.2 million in loans from 2003 through 2007 (let alone the loans repurchased in 2008), with approximately $92 million and $58 million repurchased in 2006 and  2007, respectively. Furthermore, as noted in the OCC's October 15, 2007 RoE, the net book value of the wholesale mortgage portfolio that remained unsold was $683 million, well over 90 percent of which consisted of Alt-A, ARM, sub-prime, second mortgage, and other high-risk residential loans.  In addition $166 million of residential loans were projected to become nonperforming by the end of 2008.

59.     The directors and officers had not only supported this growth, they encouraged it.   By the end of 2006, FNB Arizona's residential mortgage loans had ballooned to $7.2 billion.

**COMPLAINT FOR DAMAGES**

60.    The directors and officers continued to urge growth in late 2006 and early 2007.  A December 2006 press release bragged about the record increases in Alt-A loan production, and stated that the bank had "the flexibility to provide programs for consumers who don't have quite enough income or have too much debt to qualify for traditional mortgages."  *See* Ex. D.  Yet in a letter to the OCC, the bank admitted that it was aware of "indications that the Alt-A market was deteriorating in certain product segments" in September 2006, several months before the press release.  *See* Ex. E.

61.    And in a March 15, 2007 publication Gary Dorris stated: "[w]e even had an article in the local Phoenix paper that unfortunately listed FNBA in a compilation of some mortgage companies that were troubled.  Pat Lamb and his executive group are communicating the strength of our company and our commitment to the mortgage business on a daily basis to our employees and customers. I wanted to take this opportunity to convey not only our commitment to the mortgage business but also our faith and trust in those who lead the mortgage division of FNB. We were among the first to recognize the volatility in the mortgage market and reacted by changing our product mix to mitigate risks."  *See* Ex. F.

62.    The directors and officers continued this downward spiral even after the investors told them they would not purchase loans.  Once residential real estate prices stopped rising and loan defaults began to increase, investors refused to purchase loans from FNB Arizona.  Rather than stop production, however, new loans were written using different standards determined, again, not by the bank, but by the investor groups purchasing the loans.  And again, no purchase guarantees were obtained.

This happened not once, but several times, which led to further increases of substandard loans in the bank's portfolio--loans which the investor groups would later refuse to purchase as well.

63.    As a result of the directors and officers' negligent and grossly negligent acts and omissions in the management of the bank, FNB Arizona's financial position quickly unraveled in late 2006 and early 2007 as losses and reserve requirements overwhelmed the organization.   In 2007, FNB Arizona decided to close its national wholesale mortgage operation and terminate more than 540 people.   In June 2008, under approval of the OCC, FNB Arizona (Cert# 27508) was acquired by FNB Nevada (Cert# 27011) and the merged entity operated under FNB Nevada (Cert# 27011).   Ultimately, on July 25, 2008, FNB Nevada was placed in receivership via an all deposit transfer by Mutual of Omaha Bank (Cert# 32325).

64.    Each of the directors and officers was negligent and grossly negligent exercising their respective duties of care given the obvious risks of their business model.   And each of the directors and officers was negligent and grossly negligent because the risks were obvious.

## VI.    FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duties Against Each Defendant)

65.    FDIC incorporates by reference paragraphs 1 through 64, inclusive, of this complaint as though fully set forth.

66.    As directors and officers of the bank, the defendants had a duty to ensure the safe and sound operation of the bank.   At a bare minimum, these defendants had a duty to ensure that FNB Arizona had prudent lending policies in place, that those policies were reviewed on an annual basis, and that bank management complied with those policies.

Defendants had a duty to adopt mortgage real estate lending policies that, among other things, included a loan portfolio diversification policy that set meaningful limits for real estate loans by type, geographic market (*e.g.,* limits on higher risk loans) and concentration, and established review and approval procedures for exception loans, including loans with LTV percentages in excess of supervisory limits.

67.     Defendants, as directors and officers of FNB Arizona, owed a duty to the bank to carry out their responsibilities by exercising the degree of care, skill, and diligence that ordinarily prudent persons in like positions would use under similar circumstances, as derived from common law and statutory regulations.   *See* 12 C.F.R. Part 365 & Appendix A, 12 C.F.R. Part 364 & Appendix A and 12 C.F.R. Part 337. These duties included, among others:

   a. To conduct the business of the bank in compliance with its own internal policies, including but not limited to loan policies and lending limitations;

   b. To establish, enforce and follow careful, reasonable, prudent, and non-negligent management practices, including prudent lending policies and sound business judgment and candor;

   c. To ensure the careful, reasonable, prudent and non-negligent underwriting and administration of the bank's loans; and

   d. To ensure that the bank did not engage in unsafe, unsound, unreasonable and imprudent practices.

68.     At a minimum, prudent management requires real estate lending standards that require:

The institution should monitor conditions in the real estate markets in its lending area so that it can react quickly to changes in market conditions that are relevant to its lending decisions. Market supply and demand factors that should be considered:

- Demographic indicators, including populations and employment trends.

- Zoning requirements.

- Current and projected vacancy, construction, and absorption rates.

- Current and projected lease terms, rental rates, and sales prices, including concessions.

- Current and projected expenses for different types of projects.

- Economic indicators, including trends and diversification of the lending area.

- Valuation trends, including discount and direct capitalization rates.

12 C.F.R. Appendix A. to Part 365.

69. According to the FDIC's Primer on Use of Interest Reserves,[5] "[c]redit quality [in the U.S.] began to show signs of weakening in 2006 as the level of noncurrent ADC loans [loans where payments have fallen behind schedule] began to rise. By year-end 2007, noncurrent loans had reached 3.15 percent--the highest level in more than 10 years--and more than triple the rate for other commercial real estate loans."

70. As directors and officers of a national bank, the directors and officers occupied a position of trust with respect to FNB Arizona. As such, they owed the bank duties of loyalty and were required to perform their duties in good faith and in a manner each of them believed to be in

---

[5] http://www.fdic.gov/regulations/examinations/supervisory/insights/sisum08/article01_primer.html;
*See* Ex. G.

COMPLAINT FOR DAMAGES

the best interests of the bank, at the expense of their own personal interests. They had a duty to keep themselves informed and were not allowed to engage in acts or omissions amounting to an unexcused pattern of inattention or to abdicate their duties as officers and/or directors. Nor were they to engage in acts from which they derived an improper personal benefit. In short, a director or officer in performing his or her duties must act in good faith, in the best interests of the corporation and of its shareholders, and with such care, including a duty of reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

71.    The defendants breached their duties in the management of the bank by, among other things, adopting a lending strategy that could only fail and relying on impossible assumptions. Furthermore, the defendants breached their fiduciary duties, and were negligent and grossly negligent by, among other things:

    a. Allowing the wholesale mortgage operation to expand to such a point where in 2006 in excess of 85% of the bank's residential mortgage loan portfolio consisted of high risk Alt-A products.

    b. Ignoring safety and soundness standards on the assumption that loans would be purchased.

    c. Not obtaining any purchase guarantees from investors in the secondary market to insure the bank could sell the risky loans it was purchasing.

    d. Incorporating repurchase provisions into their contracts with investors, but not doing the underwriting necessary to avoid the use of such provisions.

    e. Failing to set and enforce any meaningful concentration limits on particular loan types.

    f. Expanding the bank's portfolio by increasing the number and concentration of layered and high risk

**COMPLAINT FOR DAMAGES**

loans.

g. Failing to adopt lending policies that mitigated the risks inherent in layered and high risk loans.

h. Failing to monitor or require the bank's adherence to underwriting standards.

i. Creating a business plan that depended on rising residential real estate values indefinitely into the future.

j. Creating a business plan that relies on loans that show no evidence of a borrower's repayment capacity.

k. Ignoring repeated warnings of the risk involved from regulatory authorities, staff and others.

l. Relaxing underwriting standards to increase the concentration of layered and high risk loans in FNB Arizona's portfolio even after the real estate market slowed.

m. Continuing these practices even after they should have known that they were unsafe and unsound.

72.    As a result of the foregoing breaches of the duty of care, among others, FNB Arizona, and subsequently FNB Nevada, suffered massive losses that resulted in FNB Nevada's failure.

73.    As a result of defendants' breaches of their duties, FDIC has suffered damages not fully ascertained but believed to exceed $193 million.

## VII.    SECOND CLAIM FOR RELIEF

### (Negligence, and Gross Negligence Against Each Defendant Under 12 U.S.C. §1821(k))

74.    FDIC incorporates by reference paragraphs 1 through 73, inclusive, of this complaint as though fully set forth.

75.    As directors and officers of a federally insured bank, under 12 U.S.C. §1821(k), defendants may be held personally liable for gross

**COMPLAINT FOR DAMAGES**

negligence.  Under Arizona law, the defendants in this case may be held personally liable for acts or omissions constituting simple negligence.

76.     Each of the defendants was negligent and grossly negligent in performing his duties in the management of the bank given the obvious and known risks posed by the wholesale mortgage department and their business plan.   As stated above, defendants breached their fiduciary duties, and were negligent and grossly negligent by, among other things:

    a. Allowing the wholesale mortgage operation to expand to such a point where in 2006 in excess of 85% of the bank's residential mortgage loan portfolio consisted of high risk Alt-A products.

    b. Ignoring safety and soundness standards on the assumption that loans would be purchased.

    c. Not obtaining any purchase guarantees from investors in the secondary market to insure the bank could sell the risky loans it was purchasing.

    d. Incorporating repurchase provisions into their contracts with investors, but not doing the underwriting necessary to avoid the use of such provisions.

    e. Failing to set and enforce any meaningful concentration limits on particular loan types.

    f. Expanding the bank's portfolio by increasing the number and concentration of layered and high risk loans.

    g. Failing to adopt lending policies that mitigated the risks inherent in layered and high risk loans.

    h. Failing to monitor or require the bank's adherence to underwriting standards.

    i. Creating a business plan that depended on rising residential real estate values indefinitely into the future.

**COMPLAINT FOR DAMAGES**

j.  Creating a business plan that relies on loans that show no evidence of a borrower's repayment capacity.

k.  Ignoring repeated warnings of the risk involved from regulatory authorities, staff and others.

l.  Relaxing underwriting standards to increase the concentration of layered and high risk loans in FNB Arizona's portfolio even after the real estate market slowed.

m. Continuing these practices even after they should have known that they were unsafe and unsound.

77.   These actions and omissions were not only negligent, but constituted an extreme departure from what a reasonably careful bank director or officer would do in the same situation to prevent harm to the bank.

78.   As a direct result of the defendants' negligence and gross negligence, FNB Arizona, and subsequently FNB Nevada, suffered massive losses that resulted in FNB Nevada's failure.

79.   As a direct result of defendants' breaches of their duties of care, negligence, and gross negligence, the FDIC has suffered damages not fully ascertained but believed to exceed $193 million.

## VIII.   PRAYER FOR RELIEF

80.   Wherefore FDIC prays for damages as follows:

81.   Compensatory damages according to proof;

82.   Costs of suit; and

83.   Such other and further relief as this Court deems appropriate.

Respectfully submitted this 23rd day of August, 2011.

**COMPLAINT FOR DAMAGES**

**FEDERAL DEPOSIT INSURANCE CORPORATION**

Jeffrey A. Sandell,
Arizona State Bar No. 020658
E-mail: jsandell@fdic.gov
Bob J. Rogers *pro hac vice* pending
Texas State Bar No. 17163400
Email: brogers@fdic.gov
1601 Bryan St., 15th Floor
Dallas, TX  75201
972.761.2280 Telephone
972.761.8181 Facsimile


**MULLIN HOARD & BROWN, L.L.P.**

John M. Brown, *pro hac vice* pending
Texas State Bar No. 03142500
jmb@mhba.com
Anthony W. Kirkwood, *pro hac vice*
pending
Texas State Bar No. 24032508
tkirkwood@mhba.com
500 S. Taylor
Suite 800
Amarillo, Texas 79101
(806) 372-5050 Telephone
(806) 372-5086 Facsimile

Attorneys for Federal Deposit
Insurance Corporation, as Receiver
for First National Bank of Nevada

**COMPLAINT FOR DAMAGES**

## DEMAND FOR JURY TRIAL

FDIC demands a jury trial.

DATED: August 23, 2011   Federal Deposit Insurance Corporation
Jeffrey A. Sandell
Bob J. Rogers

Mullin Hoard & Brown, L.L.P.
John M. Brown
Anthony W. Kirkwood

By: _____

Attorneys for Plaintiff, Federal Deposit
Insurance Corporation, as Receiver for
First National Bank of Nevada

31