P. Lamb Exh. 10
2/28/11

**FIRST NATIONAL BANK OF ARIZONA**

Home of Alt-A Mortgage Lending℠

1st
NATIONAL
BANK OF ARIZONA
Home of Alt-A Mortgage Lending℠

# Weekly Mortgage Update

Volume 2, Issue 52          December 29, 2006

## Message From The President

Every year for my last message I talk about what a great job everyone has done, recap our success for the year, and talk about putting all of our focus and energy into raising the bar next year. Then I tell you my resolution for the New Year and send you off inspired.

I think we are going to mix it up a little bit this year. I don't want to spend a lot of time recapping the huge effort everyone contributed to grow production in a declining market. We don't need to go over the huge success we had in implementing Empower, converting to GMAC subservicing, or implementing a state of the art imaging/post-closing system through Accenture and Epitome. I also don't want to rehash the details of the $14 million in annual cost savings we squeezed out of the business this past year.

2006 is over. Every year I am amazed by how much we accomplish, but even more amazed by how much more opportunity we have to improve our execution and expand our business. That's where I want to focus today.

We have already set our goals through the strategic planning process for the division and for the bank. You already know that we are going to focus on growth next year, and that we are going to grow efficiently. We have put the pieces in place to scale our mortgage business up and to make everyone who reads this more efficient and effective. All we need now is for you to do your part to execute and do your part to achieve the goals for FNBA.

So, what are you going to do day in and day out to make that contribution in 2007? If you are going to make a resolution this year related to your professional life, it should answer that question. Believe me, focusing on what you need to do to meet the organization's goals is the best way to find success for both your personal career goals and for the company.

I have one big example of that today. This month, for the first time since 2003, we have an AE that is going to produce $30MM (in one month). Jay Patel decided when he moved back to Virginia that he was going to do his part to grow FNBA's business in Northern Virginia and set his personal goal to finish as the top volume

## Western Division Update

### AZA IN WONDERLAND

Once upon a time there was an Account Executive named Aza Olival who lived in San Diego, California. Because Aza was one of California's top sales reps and so sure of himself, he was willing to bet his manhood.



One day another San Diego account executive, Jorge Bustamante, approached Aza with a challenge. The challenge was regarding dollar volume funded for the month of November. At that point in time, Aza and Jorge were neck-and-neck with fundings.

Aza, of course, couldn't resist the challenge. The loser of the bet would have to wash the winner's car in an *'appropriate'* costume decided on by their boss, Area Sales Manager Jim Patterson. The account executives worked away visiting offices, returning calls, fixing problems and closing loans.

In the end, Jorge pulled ahead of Aza by just $134,868! Aza was man enough to own up to his bet and wash Jorge's car in an Alice in Wonderland costume….and the entire San Diego office was rewarded with the humor of watching!

Congratulations to both Jorge and Aza who funded $7,816,786 and $7,681,918, respectively.

THE
END



GD00011130



EXHIBIT

A



his part to grow FNBA's business in Northern Virginia and set his personal goal to finish as the top volume producer at FNBA in 2006. Part of that goal was to have a $30MM month this year. By focusing on the little things he needed to do every day (sales calls, War Room, supporting operations, leveraging niches, building relationships, selling exceptions, and everything else you have heard 1,000 times) Jay was able to build and grow our business in a shrinking market.

Decide what you need to do every single day to be successful and meet your goals and the goals of the business. That should be your resolution for 2007. That is how you will succeed and excel in 2007, regardless of what happens to the rest of the industry (remember, next year is going to be tougher than last year).

I have only asked a couple of times for you to respond to my update message. This is one of those times. Send me your resolution and tell me what your goal is for 2007 and how you are going to get there. I know your goals match mine and I want to help you get there so we can both be successful. I will keep track and check up on you to make sure you stay focused.

Think about it this weekend and send me something next week.

Have a safe and happy New Year.

## Eastern Division Update

*Submitted by Craig Chapman*

Last Wednesday I attended a holiday function hosted by Gilbert Sanchez and his team.

It was an incredible event and afforded me time to visit with some of our most loyal and tenured brokers. One customer in particular, Jose Blandon from Blandon Financial, reminded me exactly why brokers enjoy working with us. Jose asked me how our year was going and I proudly proclaimed we are up from last year! He informed me he was not surprised to hear this. I asked him why and fully expected to hear something about our 5-year CMA, or one our other fantastic programs.

He paused and told me Gilbert and his team (Maria Aragon in Florida; Christina Gutierrez, Jon Borchers, Jason Ward, William Powers, Gustavo Ventura, and Byron Degassi in Charlotte) are the most professional in the business. (This also applied to his old team from VA – Teresa Torres, Azita Yazdani, Tamika Jones, Jon Bennett and Bobby Earley!) He said they call quickly with good news, and even faster with bad news.

I asked him what he thought about our pricing and

## Product Niche of the Week

Below is the weekly comparison of FNBA to CW and FMFC. Greenpoint is omitted this week due to the lack of a working password. If you have one, please contact Marketing.

When comparing the AZ Express 5yr ARM to the CW Non-Conforming 5yr ARM, CW has a very slight rate advantage at 85 and 90LTV. FNBA offers a lower rate by 0.160 at 95LTV.

When comparing the AZ Express 30yr fixed to the CW Non-Conforming 30yr fixed, FNBA offers a lower rate at 85, 90, and 95LTV. Our biggest rate advantage is 0.775 at 95LTV.

When comparing the AZ Express 5yr ARM to the FMFC Self Insured Advantage 5yr ARM, FNBA offers lower rates at 85, 90, and 95LTV. Our biggest rate advantage is 0.985 at 95LTV.

When comparing the AZ Express 30yr fixed to the FMFC Self Insured Advantage 30yr fixed, FNBA offers lower rates at 85, 90, 95, and 100LTV. Our biggest rate advantage is 0.970 at 95LTV.

*Additional Sales Tip:*
Did you know you can qualify a stated / stated 95% LTV at 4.875% on a 30yr.........3-2-1 buy-down?

## Avenue Xpress Update

We are proud to introduce Landsafe as a credit vendor option for our Alt-A engine!

For more information, please click on the links below, or visit the Mortgage Home Page on Bankline and click on the Mortgage Announcement link.

Landsafe Announcement

Avenue Xpress Sample

## Mortgage News You Can Use

Below is an email message received last week that reinforces the fact that undisciplined credit policy is sinking many ships. This is the perfect time for us to gain market share the correct way.

 Harbourton Mortgage Investment Corporation:

GD00011131

I asked him what he thought about our pricing and programs. He said they are ok. I sort of laughed to myself because I heard the exact same thing from one of Don Rubin's brokers a few weeks back. I mention this because we must not lose sight of what helped us thrive in '06. Our brokers like working with us. The AEs and WAMs have done an incredible job war-rooming our customers. Our brokers view us as critical business partners. An impressive feat indeed......

The basics will allow us to continue to grow in 07:

- · Return calls
- · Know our programs (own what you sell)
- · War room/roll outs (there is no substitute)
- · Be positive (there will be a ton of negativity in 07)
- · QBQ

Have fun!

## Super Bowl Sweepstakes Update

To date, we have received **650** fax entries! Keep promoting this with your brokers.



Harbourton Mortgage Investment Corporation:

To All HMIC Business Partners,

It is with deep regret that we announce Harbourton Mortgage Investment Corporation will cease operations effective the close of business today, December 20th, 2006.

We are extremely proud to have had the opportunity to serve our Brokers, Investors and Business Partners and wish everyone much success in the future.

## FNBA Photo of the Week

Below is a photo of Karen Barton, Correspondent Western Division Sales Manager. She lives in Castle Rock, Colorado where they've received more than two feet of snow and it's still coming down. Wax those skis!



**Market Data—Rates Provided by Bloomberg.com as of 12/29/06 12:39 p.m. ET**

### KEY RATES

|  | CURRENT | 1 MO PRIOR | 3 MO PRIOR | 6 MO PRIOR | 1 YR PRIOR |
|---|---|---|---|---|---|
| Federal Reserve Target Rate | 5.25 | 5.25 | 5.25 | 5.00 | 4.25 |
| 3-Month Libor | 5.36 | 5.37 | 5.37 | 5.51 | 4.53 |
| Prime Rate | 8.25 | 8.25 | 8.25 | 8.25 | 7.25 |
| 5-Year AAA Banking & Finance | 5.17 | 5.04 | 5.15 | 5.83 | 4.92 |
| 10-Year AAA Banking & Finance | 5.40 | 5.29 | 5.45 | 6.12 | 5.19 |

### U.S. TREASURIES

|  | DISCOUNT/YIELD |
|---|---|
| **BILLS** |  |
| 3-Month | 4.88 / 5.01 |
| 6-Month | 4.89 / 5.08 |
|  | **CURRENT PRICE/ YIELD** |
| **NOTES/BONDS** |  |
| 2-Year | 99-28 / 4.82 |
| 3-Year | 99-22 / 4.74 |
| 5-Year | 99-20+ / 4.70 |

### YIELD CURVE



| | |
|---|---|
| 5-Year | 99-20+ / 4.70 |
| 10-Year | 99-09 $^{1/2}$ / 4.71 |
| 30-Year | 94-28 / 4.83 |
| | **CURRENT PRICE/ YIELD** |
| **INFLATED INDEXED TREASURY** | |
| 5-Year | 99-20 / 2.47 |
| 10-Year | 100-24 / 2.34 |
| 20-Year | 93-29 / 2.40 |
| 30-Year | 120-24 / 2.29 |

To print a copy of this Update, visit the Mortgage Home Page on Bankline. Comments? E-mail **nbeck@fnbaonline**.

GD00011133

From:           Farmer, Becci on behalf of Lamb, Ray
Sent:           Tuesday, March 15, 2005 12:50 PM
To:             Hoskin, Craig; Whalen, Michael; Oakley, Bill; Dorris, Gary; Lamb, Pat; Lamb, Phil; Halloran,
                Kevin; Willsey, Jim; Williams, Dennis
Cc:             Husted, Sylvia
Subject:        Article of Interest

(Sylvia - This needs to go to all lending officers in AZ and NV. Can you forward? Tonya used to do that for me, but she is out. Thanks. Becci)

TO:        Loan Committee
           Lending Officers in Arizona and Nevada

I am attaching for your information and your required reading a copy of an article from the Sunday, March 13, 2005 *Arizona Republic*.

Basically, the cost of a home in the Phoenix area jumped 25% in the past year and potential homebuyers income rose only 2% to $49,500. Clearly, this should send a message to all of us.

The article further says that in order to be able to afford a $200,000 house that you need to make at least $50,000 per year. In other words, the average household income in Phoenix can marginally buy a $200,000 home.

As I have been saying, we do not want to finance homes that are outside the entry level, which means that we may not want to finance homes more than $200,000, but certainly not if they cost more than $250,000, particularly, when interest rates are rising rapidly. In 2004, the national median price for an existing house reached a record $189,000. If all of us can't read what is going to happen in the future and learn from the past market corrections and declines, we are doomed to failure. Hopefully, we do not want our First National Bank to be doomed because of the decisions we are making today.

The same would be true for our Tucson, Reno and Las Vegas markets. It should be clear that we don't want to spend our time looking for housing in excess of these prices if we want to be a survivor. Particularly, we do not want to be compromising credit, credit policy or other lending standards that we know are built in for our own protection. Do not spend your time chasing housing deals where we can't find the purchasers able to afford the buy the homes. If any of you don't agree with this, I ask that you send me an email with a copy to all other credit and lending people. If I do not receive emails from any of you, I will assume that we are all in agreement and on the same page as to lending for housing.

*Raymond L. Lamb*
Chairman and Chief Executive Officer
First National Bank
480-458-2222
480-458-2200 · Fax

Priced out of market for a home

Valley workers left behind as cost of housing soars

Catherine Reagor Burrough



The Arizona Republic
Mar. 13, 2005 12:00 AM

Rising home prices are shutting the door on teachers, firefighters, police officers, government employees and retail and service workers who want to live near their jobs.

As prices rise in Phoenix and its closer suburbs, frustration is increasing for those who work there. Often outbid and overlooked in metro Phoenix's hot housing market, they either have to continue renting or count on a long commute from the Valley's fringes.

The cost of a home in the Phoenix area jumped almost 25 percent in the past year. The typical household income for the area inched up only 2 percent to reach $49,500, and that figure often includes two incomes.

It had not been this hard for a Valley resident to afford a home since 1989.

The phenomenon is typical of many major cities on the East and West coasts, and in Phoenix the affordability crunch is expected to get worse this year as home prices continue to climb above $200,000 and mortgage rates inch up.

## Crisis may be on way

"Phoenix is heading for a real crisis," said residential real estate developer Gregg Holmes, president of Scottsdale-based Stardust Cos.

"If our workforce can't afford to live here, the economy will suffer and growth will slow."

He is leading a group of business, civic and government leaders looking for solutions so Phoenix doesn't turn into another Los Angeles, where many people commute at least two hours a day to get to work. Other non-profit and government housing groups are trying to help Phoenix workers find housing they can afford. But the need is growing faster than the resources available.

Phoenix is in better shape than California. Median home prices in Los Angeles, San Francisco and San Diego are at least triple the $200,000 that an existing house costs in metro Phoenix. Household incomes in those California cities are only $10,000 higher.

But people in metro Phoenix are feeling the pinch between their incomes and higher home prices.

Just ask Rebecca Mahlerwein. She teaches in Tempe but can't afford a house in the same city as her kindergarten pupils. The starting salary for the typical elementary school teacher in the Valley is about $30,000. Mahlerwein's husband is also a teacher.

The couple found a house they could afford in the southwest Valley suburb of Laveen, but now Rebecca has a 40-minute drive to her classroom every day.

"I carpool with another teacher so that helps, but it would be so nice to live in Tempe," she said.

Many people with jobs important to the Valley communities where they work are forced to move farther and farther out to find homes they can afford. Much of metro Phoenix's most affordable housing is on its fringes, but most of the area's jobs are closer in.

2

## Longer commutes

"There's a disconnect if people support a community but can't afford to live in it," said Jay Butler, director of the Arizona Real Estate Center at Arizona State University.

Phoenix firefighter Gabriel Saenz has been looking for a house in the city where he works but can't find anything with enough space in a nice neighborhood for less than $200,000.

Starting firefighters make about $36,000 in the Valley. To afford a $200,000 house, a borrower needs to make about $50,000.

Out-of-state buyers helped push metro Phoenix homes sales and prices to records last year. Most are from pricier home and higher income areas such as California, the East Coast and Chicago.

Rising values are good news for sellers but not for buyers, especially first-timers who can't afford the $50 to $100 more a month that higher prices can tack onto a mortgage payment.

Higher mortgage interest rates will push monthly payments up more.

Saenz is looking in metro Phoenix's more affordable southwest suburbs of Tolleson and Avondale.

"It's not financial beneficially for me to rent. I would like to buy in Phoenix because then I am paying taxes to the city where I work," Saenz said.

If he buys in another Valley city, Phoenix could end up losing a firefighter as well as taxpayer because Saenz could get a job in Avondale or Tolleson.

## Losing workers

If people can't find houses they can afford based on the money they can make in a city, they will move just as Saenz might.

On a bigger scale, low housing costs have been one of the Valley's most attractive features for companies looking to relocate or expand.

If companies see their employees cannot buy a home in metro Phoenix, they might look elsewhere.

Business leaders see affordable housing as key to bringing in more jobs and keeping metro Phoenix's economy growing.

The goal of the Regional Workforce Housing Task Force led by Holmes is to help create more housing in all Valley communities for workers earning $20,000 to $42,000 a year. There are 500,000 people in Arizona whose salaries are $25,000 or less.

The task force wants to push for the development of more affordable housing by making it easier for builders to get through cities' zoning and design processes.

3

The group also plans to find ways to leverage funds set aside for affordable housing, such as the $20 million donation from Stardust founder Jerry Bisgrove, to provide more help to struggling home buyers.

The task force wants to ensure that in 15 years there's no shortage of affordable housing for the many workers making below the Valley's median income.

There have been some successful partnerships between Valley cities and developers to create affordable housing. A few years ago, Phoenix sold Artisan Homes a site in downtown Phoenix for half of its appraised price. As part of the deal, the houses sold for $135,000 and higher so families earning $40,000 to $80,000 a year could afford them. Several government workers with jobs in central Phoenix were able to buy in the new development and cut their commutes in half.

Until last year, metro Phoenix's housing prices were below the U.S. average. In 2004, the national median price for an existing house reached a record $189,000.

Major metro Phoenix employers like financial firm Wells Fargo, insurer USAA, electronic-component distributor Avnet and semiconductor firm Motorola all moved or expanded in the Valley partly because of the affordable housing available for their workers.

Chere Oliver is a paralegal for Wells Fargo. Her job was moved from the firm's downtown Phoenix office to a new facility in Chandler last year. She rents an apartment in north Phoenix and commutes almost an hour each way to work.

"I want to buy a townhome close to my new office, but I can't find anything," said Oliver, who has been approved for a $130,000 loan and been searching for a home she can afford in Chandler or Ahwatukee since September.

"I am 36. I want to get into the housing game while I can so I am not renting for the rest of my life."

**Paying too much**

Investors willing to pay more than a seller's asking price have beat her out on every house on which she has made an offer.

"There are a lot of sad people out there working full time who can't find houses they can afford near their jobs," said Tina Rose, Arizona manager of Allied Home Mortgage. "Prices keep going up, making it even worse for them."

Metro Phoenix's rising housing costs and relatively flat income gains have many home buyers and renters paying more than they can comfortably afford.

An estimated 27 percent of all Arizona homeowners and 47 percent of all renters spend more than 30 percent of their income on housing, according to the Workforce Housing Task Force.

Families that spend that much on housing could be forced to scrimp on essentials such as food, clothing, education, day care and health care.

Danielle Espinoza was paying $650 in rent, more than 30 percent of the pay she brings home as a receptionist for Allstate Insurance.

She grew up moving several times and remembered the instability of living that way.

"I didn't want that for my son," she said.

## Help for buyers

With the help of a Valley affordable-housing group, Espinoza was able to buy a two-bedroom condominium in Glendale last year. Her mortgage payment is $450 a month.

But it took Espinoza a while to find a home she could afford.

"The first houses I made offers on, investors bought away from me," said Espinoza, who took classes on buying a home and establishing credit at Neighborhood Housing Services of Phoenix.

Rita Carrillo, executive director of the non-profit Neighborhood Housing Services, said the housing affordability crisis will intensify as the Valley's grows.

"I can't imagine how my friends will ever be able to buy houses if prices keep climbing," Espinoza said.

During the past five years, home prices in Great Phoenix have increased more than 55 percent, but incomes are up less than 10 percent. There is no sign of housing prices stabilizing this year. Thirty-year mortgage rates are expected to climb to at least 6.5 percent adding $100 onto the monthly payment for a $200,000 house.

Butler said solving the affordable housing problem isn't only about providing less expensive homes or help with down payments.

"Incomes in Phoenix need to rise to keep pace with the area's higher cost of living," he said.

DRAFT

**First National Bank Holding Company**
Strategic and Valuation Review
August 31, 2005

Frederick Cannon, CFA
Keefe, Bruyette, and Woods

**Summary**

First National Bank Holding Company (FNB) is a rapidly growing commercial bank serving the desert southwest, with 25 branches through separately chartered state organized subsidiary banks in Arizona, California, Nevada and New Mexico. In addition, the company has a large, primarily wholesale, mortgage operation, a national merchant processing company and a national home-owners association banking division. The bank is privately owned. Bank assets now exceed $3 billion, up from $320 million at the end of 2000.

Although the company has a number of successful business lines, in our opinion the primary asset of the institution in the southwest commercial bank. In our view, a 5-year strategic plan to maximize the value of the institution would be threefold:
- Continue to grow the commercial banking operations in AZ, NV, CA, and NM adding core deposit market share and high quality loans.
- De-emphasize the mortgage operations due to the headwinds in the mortgage business, including over-extend home prices in the southwest, excess industry capacity and risk of secondary market dislocations.
- Continue to pursue niche businesses, including merchant processing and the home-owner association business primarily in order to build capital to support the expansion of the southwest commercial bank.

In our view, with such an approach, First National Bank Holding Company will emerge as a premier southwest commercial bank in five years, with significant market share in its core markets. Under this scenario, in 5 years that we believe with continued excellent business execution, FNB could emerge as a $7.5 billion asset institution (20% annual growth) with a market value (public company equivalent) in excess of $1.5 billion. This scenario, in our view, is superior to the valuation of a more diversified financial institution dependant on volatile mortgage related income.



EXHIBIT
C

## Financial Position

FNB has grown rapidly in all their lines of business since its founding. However, the growth in mortgage, and recent challenges, has distorted the traditional financial measurements at FNB from those of a traditional commercial bank. As shown in Exhibit 1, FNB has a strong margin consistently over 4.50%, similar to that of the top tier of commercial banks in the KBW universe. However, fees are much higher as a portion of revenue than at other commercial bank (fees average approximately 20% of revenue at peer commercial banks) due to the large impact of the mortgage company. The loan to deposit ratio at FNB at 115% is also high due to the impact of the large mortgage business, including loans held for sale, suggesting that FNB has a more thrift-like balance sheet than other commercial banks. The large and volatile income of the mortgage company has also created significant volatility in profitability at FNB. With recent improvements in the operations of the mortgage company, profitability will improve. However, the structure of the financial metrics at FNB will remain those of a hybrid commercial bank-mortgage company, rather than those of a pure commercial bank, as long as mortgage operations remain a large share of the bank.

Exhibit 1
**FNB Financial Metrics**

|                              | 2003    | 2004    | 2005Q1  |
|------------------------------|---------|---------|---------|
| Net Interest Margin          | 4.67%   | 5.02%   | 4.96%   |
| Fees as a Percent of Revenue | 67.4%   | 53.0%   | 36.9%   |
| Expense/Revenue              | 52.9%   | 69.6%   | 89.3%   |
| Provision/Loans              | 0.65%   | 0.41%   | 0.00%   |
| Tax Rate                     | 38.1%   | 35.9%   | 43.3%   |
| Return on Assets             | 3.06%   | 1.55%   | 0.39%   |
| Return on Equity             | 52.4%   | 27.9%   | 7.1%    |
| Deposits/Loans               | 119.6%  | 113.7%  | 114.6%  |

Source: SNL, FFIEC

**Characteristics of First National Bank Holding Company**

The recent history and financial position of FNB, as discussed above, as a hybrid commercial bank-mortgage company underscores a number of characteristics of the bank that relate to long term prospects and valuation.

- Rapid Growth: As discussed, the primary characteristic of FNB is rapid growth. The company has grown all its business rapidly in recent years, including commercial banking through the strong relationships of its officers and the hiring of key lending teams.
- Volatile Income: As shown in Exhibit 2 below, quarterly income has been volatile during the past two years. This is the result, in our view, of two factors: dependence on mortgage banking income and, FNB status as a private company.

Exhibit 2
**FNB Quarterly Income**



- Outlook for improved profitability: The current depressed levels of profitability at FNB (through the first quarter of this year) should improve with improved performance of the mortgage bank. Over time we would expect that FNB can achieve the sustained profitability levels of peer community banks, similar to what is shown in Exhibit 3. However, none of these peer bank are as reliant on mortgage banking.

Exhibit 3
**Peer Bank Financial Metrics--2004**

|  | City National | Western Alliance | Community Bank of Nevada |
|---|---|---|---|
| Net Interest Margin | 4.73% | 4.00% | 4.64% |
| Fees as a Percent of Revenue | 25.2% | 9.4% | 6.0% |
| Expense/Revenue | 52.6% | 56.0% | 56.2% |
| Provision/Loans | 0.00% | 0.32% | 0.49% |
| Tax Rate | 39.3% | 35.2% | 30.3% |
| Return on Assets | 1.63% | 1.12% | 1.31% |
| Return on Equity | 16.8% | 17.5% | 19.2% |
| Loans/Deposits | 75.0% | 65.4% | 86.4% |

Source: Company Report, KBW Research

- <u>Limited Capital:</u> As a private company, FNB will continue to operate near the low end of peer capital levels, with limited access to capital. Options for capital for growth include retained earnings (with improved profitability ROE and capital could grow 20% per year), alternative forms of capital such as new forms of preferred stock, and, if appropriate, the sale of some business units.

- <u>High Future Potential Public and/or Acquisition Valuation:</u> As we discuss below, FNB has a high potential valuation in either an acquisition or as a public company if it continues to grow as a southwestern commercial bank. Valuations well above book value could be realized due to the operational strength of the company and its position in the strongest growing markets in the country.

## Valuation

Current commercial bank valuations in the regions that FNB operates are some of the highest in the country. Recent IPOs by Valley Bancorp, Community Bank of Nevada and Western Alliance demonstrated strong investor appetite for southwest regional banks. Exhibit 4 presents market valuations for regional commercial banks. As shown, price to earnings multiples are currently at 17.5 times on 2005 earnings, and price to book values are at 2.9 times. High valuations in the region are due to the strong population and economic growth expected in the southwest in the coming decades. The banks shown are primarily commercial banks with significant real estate lending.

Exhibit 4
**Southwest Bank Valuation Metrics**

| Company Name | Ticker | State | Total Assets 03/05 Q ($Mln) | Market Cap ($Mln) | Price 8/29/05 | P/E Multiples | | | Book Value Multiples | | Core Deposit Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | LTM EPS | 2005 EPS | 2006 EPS | P/BV | P/TBV | |
| CVB Financial Corp. | CVBF | CA | 4,832 | 1,242 | 20.14 | 19.55 | 18.14 | 15.98 | 3.83 | 4.43 | 33.8% |
| First Community Bancorp | FCBP | CA | 2,811 | 787 | 47.98 | 19.86 | 17.63 | 15.99 | 2.06 | 6.21 | 32.6% |
| Western Alliance | WAL | NV | 2,339 | 653 | 29.50 | 25.21 | 23.60 | 21.07 | 3.00 | 3.07 | 21.9% |
| Placer Sierra Bancshares | PLSB | CA | 1,832 | 403 | 27.06 | 22.74 | 17.13 | 14.63 | 2.09 | 5.16 | 23.3% |
| TriCo Bancshares | TCBK | CA | 1,656 | 344 | 21.69 | 17.24 | 15.54 | 13.58 | 2.47 | 2.89 | 17.9% |
| Capital Corp of the West | CCOW | CA | 1,505 | 289 | 27.54 | 18.30 | 17.05 | 15.36 | 2.71 | 2.74 | 18.2% |
| Center Financial Corporation | CLFC | CA | 1,387 | 404 | 24.73 | 23.78 | 17.69 | 15.48 | 4.24 | 4.32 | 42.7% |
| First Regional Bancorp | FRGB | CA | 1,387 | 257 | 65.75 | 19.06 | 13.15 | 11.54 | 3.17 | 3.18 | 18.0% |
| Western Sierra Bancorp | WSBA | CA | 1,218 | 257 | 33.50 | 16.92 | 15.09 | 12.98 | 2.25 | 3.20 | 21.4% |
| Central Coast Bancorp | CCBN | CA | 1,168 | 252 | 17.90 | 18.84 | 18.57 | 15.04 | 2.41 | 2.41 | 18.9% |
| Sierra Bancorp | BSRR | CA | 1,003 | 221 | 22.80 | 17.25 | 16.62 | 15.07 | 3.02 | 3.27 | 25.4% |
| Silver State Bancorp | SSBX | NV | 730 | 202 | 33.25 | 19.11 | NA | NA | 4.31 | 4.31 | 27.9% |
| Community Bancorp | CBON | NV | 634 | 206 | 30.76 | 22.46 | 20.78 | 16.77 | 2.82 | 2.62 | 26.9% |
| Valley Bancorp | VLLY | NV | 311 | 84 | 29.95 | 18.96 | 18.60 | 14.33 | 2.26 | 2.26 | 22.0% |
| Average | | | 1,628 | 401 | | 19.93 | 17.51 | 15.15 | 2.89 | 3.58 | 25.0% |

The challenge to building strong value at FNB is the current reliance on mortgage banking. As shown in Exhibit 5 below, the mortgage banks and thrifts receive far lower market premiums than do commercial banks, with average price-earnings ratios 6 multiples below those of commercial banks and average price-book ratios half the level of commercial banks. These lower valuations are primarily the result of the much higher volatility of mortgage banking income, the commoditization of mortgage banking which limits relationship pricing, and current concerns over the sustainability of mortgage banking income.

Exhibit 5
**Mortgage Bank Valuation Metrics**

| Company Name | Ticker | State | Total Assets 03/05 Q ($ Mln) | Market Cap ($ Mln) | Price 8/29/05 | P/E Multiples LTM EPS | P/E Multiples 2005 EPS | P/TBV | Deposit Premium |
|---|---|---|---|---|---|---|---|---|---|
| Downey Savings | DSL | CA | 15,496 | 1,746 | 63.00 | 9.42 | 8.56 | 1.58 | 5.76% |
| Flagstar | FBC | MI | 14,917 | 1,073 | 17.50 | 9.94 | 9.89 | 1.44 | 4.17% |
| IndyMac | NDE | CA | 13,469 | 2,610 | 41.82 | 10.62 | 9.21 | 2.00 | 19.83% |
| FirstFed | FED | CA | 9,297 | 936 | 57.86 | 13.09 | 12.00 | 1.87 | 10.94% |
| PFF Bancorp | PFB | CA | 3,970 | 726 | 29.75 | 15.99 | 16.44 | 2.14 | 13.97% |
| Average | | | 11,430 | 1,418 | | 11.81 | 11.22 | 1.81 | 10.9% |

The outlook for mortgage valuations in the next two years is problematic in our view.
First, the overheated housing market, primarily in fast growing regions such as the
southwest, is expected to slow and potentially turn negative. Second, the primary growth
in the mortgage markets during the last two years have been in unconventional products,
including sub-prime and Option ARMs which are likely to have high loss content if
housing markets cool. Third, the Federal Reserve has signaled its desire to continue to
raise interest rates, tightening monetary policy, which should eventually slow housing
and mortgage demand.



**1st**
**BANK OF ARIZONA**
Home of Alt-A Mortgage Lending™

# Feature Release

*Contact:*
Natalie Beck
Marketing Communications Manager
(480) 224-7181
Email: *nbeck@fnbaonline.com*

## 1st National Bank of Arizona Saying 'Yes' to Growing Number of Non-Traditional Home Loan Seekers
### *Borrower-Friendly 'Alt-a' Loans up 10 Percent Over 2005*

SCOTTSDALE, Ariz. (Dec. 13, 2006) – 1st National Bank of Arizona (FNBA), one of the country's largest privately-held, family-owned wholesale mortgage companies, is increasingly putting its money where its mouth is when it comes to providing home loans for borrowers with less substantial credit histories. The bank's emphasis on alt-a financing has helped it attain record production for the 10 months ending in October – a 10 percent increase over the same 10-month period last year.

In addition to its record production, the bank has seen a 15 percent increase in the average units funded per sales account executive, and the company is on track to close $1 billion in incremental mortgage originations over 2005.

"Conventional lenders usually have inflexible underwriting standards requiring extensive financial documentation and rigid income levels," explains Patrick Lamb, FNBA mortgage division president. "But as a privately-owned mortgage bank, we have the flexibility to provide programs for consumers who don't have quite enough income or have too much debt to qualify for traditional mortgages."

Alt-a loans help borrowers with less substantial credit history, fewer assets, higher loan-to-values and higher debt-to-income ratios. These programs are especially beneficial for young people who are less likely to have deep credit histories and extensive assets, such as first-time homebuyers or foreign nationals.

Self-employed borrowers who may also have difficulty documenting their assets can get a mortgage through the bank's stated-income program. Although traditional mortgages require loan

- more -



EXHIBIT

**D**

1st National Bank of Arizona

applicants to verify their income and assets with tax returns, bank statements and pay stubs, FNBA can provide financing to borrowers with good credit without that paperwork.

"As more Americans leave traditional corporate jobs, either voluntarily or through downsizing, and begin working on their own as entrepreneurs, contractors and seasonal workers, they may be unable to qualify for traditional loan products," says Lamb.

The bank's hybrid adjustable-rate mortgage products provide lower interest rates for homeowners expecting to move out of their homes in a few years. Its option ARMs help homeowners with uncertain erratic income manage their cash flow. In addition, its five-year hybrid cash management ARM combines the interest rate savings of ARMs with the cash management ability of option ARMs, offering the best of both worlds.

FNBA's alt-a products aren't limited to home loans. Whereas conventional lenders typically finance only owner-occupied single-family homes, FNBA will lend money for a range of property types including condominiums, second homes condo hotels. FNBA also offers alt-a financing for owner-occupied commercial properties, which is ideal for business owners who want to purchase a building for their business to occupy, yet prefer the hassle-free option of providing minimal income and asset documentation.

For business owners who prefer to fully disclose income and assets, FNBA offers a wide array of conventional and SBA loans up to 90 percent loan-to-values for owner-occupied property, and up to 75 percent loan-to-values for investment or income producing property.  Full document loan programs can also be used for special-purpose properties such as motels and gasoline stations.

### About 1st National Bank of Arizona

1st National Bank of Arizona is one of the largest privately-owned mortgage banks in the country. As the Home of Alt-A Mortgage Lending[SM], FNBA's wholesale, correspondent and warehouse divisions lend in 49 states, employ over 225 mortgage banking account executives who have a local presence in virtually every state, and operate five operations centers in order to provide exceptional customer service. FNBA is also the largest locally-owned bank in Nevada and Arizona with assets in excess of $4.1 billion and more than 2,000 employees.  Its retail and commercial loan products include both residential and commercial real estate loans, in addition to an active construction and land acquisition and development loan division. For more information, please visit www.fnbaonline.com.

###





NATIONAL                    1st
                                        NATIONAL
BANK OF ARIZONA     BANK OF NEVADA

Official Bank File #5
Charter Number 24189

May 10, 2007

Richard F. Schobert, Assistant Deputy Comptroller
Comptroller of the Currency
Arizona / New Mexico Field Office
9633 South 48th Street, Suite 265
Phoenix, Arizona  85044

Dear Rick:

Thank you and your team for taking the time to meet with us on Friday,
April 20. We appreciate this opportunity to keep you informed on recent
events in the mortgage industry, our tactical and strategic responses, and the
overall impact to the enterprise.

At the meeting, we provided you with copies of an agenda, mortgage
presentation, and a handout on our recent product and underwriting changes.

**Mortgage Environment**

We discussed the spillover from the subprime 'meltdown' into the traditional
Alt A market. We pointed to the speed and severity in which liquidity
withdrew from subprime, and the resultant failure of a number of prominent
non-depository subprime specialists. We noted that the flight to quality has
effectively eliminated approximately 20% of the *Alt A* market, but the impact
to subprime was much deeper. We discussed the current market conditions,
both from liquidity and pricing (margin) standpoint. As we noted, it remains
a volatile market, and we will likely know whether it is seeking equilibrium
in the next several months.

We indicated that the challenges in our mortgage division were enterprise
issues, and were being dealt with in that context. We noted that the
fundamentals in our core banking operations, outside of mortgage, remain
favorable. We cited several large criticized commercial borrowers that have
cured, and the resultant reduction in core bank non-performing assets.

EXHIBIT
Lamb 18
12-17-10



EXHIBIT
E

17600 N Perimeter
Scottsdale, AZ 85255
Phone: 480-458-2201 • Fax: 480-458-2200

May 10, 2007
Page Two

**Tactical Response**

As early as September 2006, we noted indications that the Alt A market was
deteriorating in certain product segments. We walked you through the
timing of some of those indicators, and our responses in terms of product,
pricing, and market channel adjustments. We updated you with final
numbers from our April 10th Reduction-in-Force. Throughout these changes,
we have remained within our *Alt A* business model.

We noted that we now securitize a portion of production with Freddie Mac.
These are whole loan sales with servicing released. At this point, Brian Lewis
asked for a separate summary of this activity. A memo from Secondary
Marketing EVP Weiner is included with this letter.

We also discussed numerous risk mitigation and short term expense
reduction initiatives. Some of these efforts were in process during your
October 2006 examination. We indicated that the market remains subject
continuous volatility, and we are similarly assessing the proper size and
scope of mortgage operations.

**Strategic Response**

We discussed several other key strategic steps taken to address the mortgage
environment. Most importantly, we have enhanced the governance with the
formation of a Mortgage Division Board. It has an oversight structure similar
to our legal Bank Boards. We have also added several key executives to the
mortgage division team, including Jean Bingham and John Redding. Jean has
over 30 years of mortgage banking experience, and will be targeting her
consulting efforts toward our on balance sheet exposure and loss mitigation.
EVP Redding has been appointed as our Mortgage Division CFO. John is a
CPA with 'Big 4' accounting firm background in mortgage securitizations.

As we face reduced volumes in the mortgage division, we discussed other
longer term and broad reaching cost saving potentials that are under review.
These include a number of non-critical pending technology projects and
support unit resource reviews.

We reiterated that we, like other similarly situated companies, do not know
the final length and depth of this contraction in the mortgage market. We feel
that we have taken prudent steps to minimize the direct impact to us, and

May 10, 2007
Page Three

best position our company to work through it.  However, we are preparing
for a variety of positive and negative long-term mortgage scenarios.

**Financial Impact**

We provided a schedule with both 1st quarter (actual), and 2nd quarter
(projected) financial results.  Both mortgage division and enterprise numbers
were provided on a pretax basis.  Enterprise results were also provided on an
after tax basis.  We indicated that the significant mortgage deficit in the 2nd
quarter was largely a result of working through the monthly production that
was 'locked' before the secondary market environment rapidly deteriorated.
As we work through this pipeline, and the market seeks equilibrium, we
expect our operating results to improve.  We anticipate break-even results for
mortgage in the second half of 2007, and the ability of the enterprise to absorb
these losses while showing improving capital trends.

We provided you with a schedule of the various reserves and LOCOM
adjustments taken since we first saw indications that the market was
softening.  In all cases, the balances were markedly higher than prior periods.

With the lack of market liquidity, we indicated to you our plans to
temporarily portfolio a portion of loans that were not salable at a reasonable
price.  We provided a schedule of additions to the portfolio at March 31, and
our estimate for April 30.  Brian Lewis then asked for an idea of how the
additions to portfolio loans would impact the charter legal entities.  A
summary schedule of charter-specific balance sheet impact is being prepared
for the May/June quarterly examination by Brian and his team.

**Other Matters (Non-Mortgage)**

We briefed you on several pending branch applications, and an additional
two that are under consideration.  All are in the normal course of business.

Consistent with our prior discussions with the OCC, we have continued on a
dual track to either obtain a de novo national bank charter in New Mexico, or
pursue an acquisition candidate.  As you know, the FDIC has not afforded
expedited processing in the First National Bank of Albuquerque de novo
application, and OCC licensing has responded in kind.  We will continue to
process this application as we await word from the FDIC.

May 10, 2007
Page Four

In terms of potential acquisitions, we were made aware of a small troubled state chartered banking company in southern New Mexico, and have since performed due diligence. We have placed a bid, and believe that we are in the running to prevail. Should we win the bid, we would likely structure the acquisition as a bank-to-bank merger into First National Bank of Nevada. We agreed to keep you informed throughout the process.

Brian Lewis also inquired about our prior pending litigation with Walton et al, and separately with Aurora. We indicated that the Walton case had been settled, and that the Aurora litigation was in the normal information gathering stage - in preparation for trial.

**Next Steps**

Per your request, we have enclosed a short summary of the whole loan securitization process with Freddie Mac.

You indicated that the examiners were planning to be onsite in late May and early June for the quarterly review. This will include follow-up work in the mortgage division.

Again, thank you for your time and valuable feedback. We look forward to keeping your office informed as we all work through this trying mortgage environment. Should you have any questions, please feel free to contact us.

Sincerely,

Raymond A. Lamb
Chairman

Enc.

# QUICK FOCUS

**Privately Held ~ Family Owned ~ Customer Focused**
**Volume II, Issue 5**                        **March 15, 2007**

    

## Message from the President



**Gary Dorris**

I could not be more proud of the people who manage, direct and yes, inspire our mortgage team. For the last two weeks, you could not pick up a newspaper without reading negative, and also highly incorrect or incomplete, articles about the mortgage industry. We even had an article in the local Phoenix paper that unfortunately listed FNBA in a compilation of some mortgage companies that were troubled. Pat Lamb and his executive group are communicating the strength of our company and our commitment to the mortgage business on a daily basis to our employees and customers.

I wanted to take this opportunity to convey not only our commitment to the mortgage business but also our faith and trust in those who lead the mortgage division of FNB. We were among the first to recognize the volatility in the mortgage market and reacted by changing our product mix to mitigate risks. Unlike some mortgage companies, we have a dedicated staff to minimize mortgage fraud. In fact, we have participated with the FBI in sting operations, which have resulted in criminal charges against mortgage brokers, real estate agents and appraisers who have set up schemes to defraud us and other reputable mortgage firms. We are well-known in the mortgage industry as a company that will not tolerate misrepresentations and fraud in mortgage applications and will assist in the prosecution of anyone who tries.

I always hesitate to single out one person who makes a significant contribution in a large division but I think everyone in mortgage would agree that Renea Aderhold, SVP Risk Management, has proven to be our "top cop" in ferreting out these schemes, gathering the evidence and working with authorities toward prosecution.

Below is just a partial example of the efforts of Renea and her team to ensure these criminals look elsewhere:

In 2006, we filed 502 Suspicious Activity Reports and we have already filed 225 for January and February 2006.

Testified in a grand jury in Nevada regarding pursuit of a straw buyer

Testified in a trial in Georgia with the US Attorney that is currently waiting for a verdict from the jury (largest fraud trial/case to date for Georgia)

Worked with the Georgia FBI to have a sting occur at the closing table resulting in 2 people being arrested for identity theft and mortgage fraud

Worked with the FBI in 2 separate cases in Florida regarding mortgage fraud.

Working with NY and California FBI and California on recent shut down and investigation of mortgage brokers.

Testified for a grand jury in New York for a major fraud scheme.

There is no question that this is a tough time in the mortgage business. On the other hand, Ray and I, and especially Pat and his team, view these times as opportunity to gain high-quality customers and employees who respect FNBA's diligence and integrity. We are certainly an opportunistic organization and we will use this period to strengthen our mortgage division.

## New Summerlin Banking Center

1st National Bank of Nevada is pleased to announce the opening of its Parkway Pointe banking center at 9555 Hillwood Drive, Ste. 110 in Las Vegas, NV.

"We are thrilled to join the Summerlin community," said 1st National Bank of Nevada Market President Bill Oakley. "This branch allows us to provide the kind of service that local residents and businesses deserve. We are family-owned and operated so we are poised to provide personal service and respond to individual needs. That's just one way we plan to add value to this special community."

Please help congratulate Vice-President/Branch Relationship Manager Rosalee Hedrick and her new team of friendly bankers.

## Passport USA Update

Passport USA initiative is now underway. This initiative is a great way to increase the bank's deposits and ensure the successful future of our fine organization. We are looking for all of our employees to contribute to this initiative by inviting their friends, families and businesses to bank with 1st National Bank. Two weeks ago all of the employees received Passport USA suitcases containing fun prizes, contest rules and referral cards. For each referral card that is returned to the bank resulting in a new account, the referring employee will be awarded points. Please remember to put your name on the cards before you give them out. These points will be totaled up at the end of each quarter and the top point winners will be awarded a three day weekend trip. (Please check your suitcase for all of the destinations and contest rules)

There are two ways you can participate: First, as a Team Captain. Many of the departments have already assigned Team Captains to lead their department or departments during this contest. We would like to see a few more people step up and show their leadership potential by taking on this role. You do not have to be a manager to be a Team Captain, but this is your opportunity to show that you are a leader.

Second, become a Travel Master. If you are already in the department that has a Team Captain, congratulations and we look forward to great results from you individually and from your team as a whole. If you are in the department that chooses not to participate, you still can. Let us know that you want to be a Travel Master and we will assign you to a team. Since you will be talking about this program to your friends, family and businesses during your off hours, the participation in this contest will not affect your productivity at work.

Passport USA is a great chance to get recognized as a leader and a contributor while earning free trips to some fantastic destinations. Did we mention that you will be traveling with some of our top executives?

If you have any questions regarding the contest or how you can participate, please contact Maciej Kaniewski at 480.224.8244 or by email MKaniewski@fnbaonline.com.



**EXHIBIT**

**F**

## How Your Commercial Appraisal Department

## Women of Distinction Award

## Know Your Commercial Appraisal Department

The First National Bank Appraisal Department was established in September 2005 to ensure compliance with all regulatory requirements, ensure validity and accuracy of appraisal products submitted to the bank, which in turn assists in the process of making "good money" commercial real estate loans. The department supports the commercial and construction real estate business footprints and reports up through Strategic Risk Management.

Members of the department include:

Gregg R. Baker, VP – Manager Appraisal Department
Jeff Higbee, AVP – Senior Commercial Review Appraiser
Diane Yule – Appraiser Associate
Nancy Sidlow – Administrative/Risk Management
Paul Thill – Contract Commercial Review Appraiser

The Appraisal Department has been tasked with several items, among them including:

◊ Establishing an internal commercial appraisal framework/ program that is fully compliant with interagency (federal OCC) guidelines and safeguards 'appraiser independence'
◊ Coordinating all requests for commercial real estate related appraisal services corresponding to federally regulated transactions
◊ Examining outside appraisers to compile approved appraisal lists
◊ Issuing all engagement letters to appraisers;
◊ Reviewing appraisals and reporting the results of reviews back to the supported businesses
◊ Assisting Executive Loan Committee members and business Credit Administrators regarding appraisal-related (valuation and compliance) issues
◊ Answering questions and consulting across business lines regarding valuation and regulatory guideline issues
◊ Providing periodic training in the appraisal process and regulatory compliance.

## Ask Gary & Ray

**QUESTION:** *Why is it that the benefit of Life Insurance coverage for those 65 and older decreases by 35%?*

**ANSWER:** At first I wondered if my wife sent in this question since this is the big year for me. Seriously, the answer is that this is one of the conditions set by the life insurance company, which provides our coverage for our entire employee population. Reduction in life insurance benefits at age 65 is a standard feature of employer-sponsored group life insurance plans. We accept these terms in order to obtain group rates available for the entire employee population. Employees may apply to our carrier, ING, to purchase the additional insurance; however, please note that purchase of additional coverage requires evidence of insurability and is at the employee's cost. Unfortunately, the actuarial tables work against those of us who are "active seniors", "prime time" or any of the other happy sounding designations we as we approach 65.

## Women of Distinction Award



The Southern Nevada Chapter of the National Association of Women Business Owners is hosting its 9th annual Women of Distinction Awards. Kelli Bowling, VP Commercial Lending in the Southern Nevada Region has been selected as a finalist for the Rising Star Award. Nominated by NAWBO Corporate and Member Partners, Kelli is being recognized for her significant contributions to the banking industry and to the Southern Nevada community. This is quite an accomplishment as Kelli just moved to Nevada in January 2006. We will be cheering Kelli on at the awards luncheon on March 23rd at the Luxor Las Vegas Ballroom.

Kelli Bowling

## Area Youth Cheer on Rattlers with FNB



Rattlers fans from the Big Brother/Big Sister Program

On Saturday, March 10th, FNB was pleased to partner with the Rattlers in sending 300 area youth to watch the Arizona Rattlers battle it out against the Utah Blaze. Although the Rattlers didn't manage to pull off a win, their future still looks bright. In their 16-year history, the Rattlers have captured five Western Division titles and two ArenaBowl championships.

## West Side Initiative Children's Charities Drive

This is the final week FNBA will be collecting supplies to donate to three worthy children's charities in the West Valley. Through March 16th, we will be collecting supplies for...

West Valley Crisis Center
Children's Center for Neurodevelopment Studies
Southwest Human Development

In order to best help these charities we will be collecting:

◊ **Diapers** for West Valley Crisis Center
◊ **After school supplies** for Children's Center for Neurodevelopment Studies
◊ **Children's Books** for Southwest Human Development

Please take a moment and get to know our charity partners and help us make the lives of the children they serve better by contributing to the Westside Initiative Children's Drive.

Look for the boxes at each of our Phoenix region branch locations and at Fountainhead & Perimeter location sites.

Advanced Search

Search FDIC        Su

Home  |  Deposit Insurance  |  Consumer Protection  |  Industry Analysis  |  Regulations & Examinations  |  Asset Sales  |  News & Events  |  About FDIC

Home > Regulation & Examinations > Bank Examinations > Supervisory Insights

## Supervisory Insights

### A Primer on the Use of Interest Reserves

During much of this decade, the U.S. banking industry posted record earnings, attributable, at least in part, to strong growth in commercial real estate (CRE) lending. This expansion included a considerable increase in land acquisition, development, and construction (ADC) lending. This loan segment almost tripled, from $231 billion to more than $600 billion, and grew from 9 percent to 13 percent of total real estate loans from 2001 to 2007.[1] Delinquency rates for the ADC portfolio were historically low during much of this time. However, credit quality began to show signs of weakening in 2006 as the level of noncurrent ADC loans began to rise. By year-end 2007, noncurrent loans had reached 3.15 percent—the highest level in more than 10 years—and more than triple the rate for other commercial real estate loans.[2]

In response to concern about a downturn in the housing market and potential effects on construction and development lending, the FDIC issued a Financial Institution Letter (FIL), *Managing Commercial Real Estate Concentrations in a Challenging Environment*, on March 17, 2008, that reemphasized the importance of robust credit risk management practices. Among other things, this FIL noted examiner observations of underwriting weaknesses in ADC loan portfolios where lenders added extra interest reserves when the underlying real estate project was not performing as expected. This practice can mask losses that would otherwise be reported as delinquent and erode collateral protection, increasing a lender's exposure to credit losses.[3] Examiners have observed instances where ADC loans with interest reserves make up a substantial proportion, or even a multiple, of bank capital.

This article focuses on the use of interest reserves in ADC lending, examines the risks this underwriting practice presents, and reviews regulatory guidance on the use of interest reserves. Finally, the article identifies "red flags" that should alert lenders to potential problems at each stage of the ADC cycle and reinforces the importance of evaluating the appropriateness of interest reserves when ADC projects become troubled.

#### The Use of Interest Reserves

For most lenders, the decision to establish a loan-funded interest reserve upon origination of an ADC loan is appropriately based on the feasibility of the project, the creditworthiness of the borrower and guarantors, and the protection provided by the real estate and other collateral.

The interest reserve account allows a lender to periodically advance loan funds to pay interest charges on the outstanding balance of the loan. The interest is capitalized and added to the loan balance. Frequently, ADC loan budgets will include an interest reserve to carry the project from origination to completion and may cover the project's anticipated sell-out or lease-up period.

The calculation of the interest reserve depends on the size and complexity of the ADC loan. The amount of the interest reserve is generally calculated by multiplying the average outstanding balance of the loan by the interest rate and the length of the expected development/construction period. In those instances when an ADC loan has an adjustable interest rate, the lender factors the potential for rate changes into the interest reserve calculation.

Some lenders require the borrower to pay interest as an out-of-pocket expense or may require the borrower to establish a borrower-funded interest reserve to ensure payment.[4] When applied appropriately, an interest reserve can benefit both the lender and the borrower. For the lender, an interest reserve provides an effective means for addressing the cash flow characteristics of a properly underwritten ADC loan. Similarly, for the borrower, interest reserves provide the funds to service the debt until the property is developed, and cash flow is generated from the sale or lease of the developed property.

#### Risks in the Use of Interest Reserves

Although potentially beneficial to the lender and the borrower, the use of interest reserves carries certain risks. Of particular concern is the possibility that an interest reserve could mask problems with a borrower's willingness and ability to repay the debt consistent with the terms and conditions of the loan obligation. For example, a project that is not completed in a timely manner or falters once completed may appear to perform if the interest reserve keeps the troubled loan current. This is a much different scenario from most credit transactions in which cash flow problems are eventually reflected in late or past-due payments and sometimes even in nonpayment. A loan with a bank-funded interest reserve would not exhibit these warning signs.

With little potential for monetary default during the interest reserve period, some lenders may delay recognizing and evaluating the financial risks in a troubled ADC loan. In some cases, lenders may extend, renew, or restructure the term of certain ADC loans, providing additional interest reserves to keep the credit facility current. As a result, the true financial condition of the project may not be apparent and developing problems may not be addressed in a timely manner. Consequently, a bank may end up with a matured ADC loan where the interest reserve has been fully advanced, and the



borrower's financial condition has deteriorated. In addition, the project may not be complete, its sale or lease-up may be not be sufficient to ensure timely repayment of the debt, or the value of the collateral may have declined, exposing the lender to increasing credit losses.

Some lenders also have used interest reserves on loans where interest and possibly principal should be paid by the borrower, given the nature and purpose of the loan. For example, the use of interest reserves in the following situations may not be appropriate and, as such, could heighten the lender's vulnerability to credit losses:

- Loans on projects that have experienced development or construction delays, cost overruns, sales or leasing shortages, or are otherwise not performing according to the original loan agreement and have inadequate collateral support;

- Loans used to purchase real estate with no immediate or defined plans for development or construction;

- Conversion and rehabilitation loans or renewals with no immediate plans for construction, rehabilitation, or development; and

- Loans secured by income-producing rental properties (residential or commercial) that should be amortizing.

Overall, the use of interest reserves without prudent underwriting and loan portfolio risk management practices could heighten an insured financial institution's risk profile and exacerbate loan losses, especially during times of economic stress.

**Regulatory and Accounting Guidance**

Beginning in 1985, the federal banking regulatory agencies issued guidance that addressed the use of interest reserves in the broader context of real estate lending standards and CRE concentrations.

- The Office of the Comptroller of the Currency (OCC) issued an Examining Circular in May 1985 describing OCC policies governing the accounting treatment for capitalization of interest on loans.[2] This circular states that even though regulatory and generally accepted accounting principles (GAAP) do not provide specific guidance as to when it is appropriate to recognize interest income from an interest reserve, in practice it should be based on sound lending policies, prudent credit judgment, and a thorough evaluation of the creditworthiness of the borrower.

- The *Interagency Guidelines for Real Estate Lending Policies*, issued in 1992, establish the core underwriting and risk management practices for all extensions of credit secured by real estate.[3] One provision addresses the need for an institution to establish standards for the acceptability of, and limits on, the use of interest reserves.

- The FDIC, the Office of Thrift Supervision (OTS), and the Federal Reserve Board (FRB) address the use of interest reserves as part of existing examiner guidance. Overall, this guidance reinforces the importance of providing clear standards on the use of interest reserves as part of a bank's loan policy, monitoring the adequacy of the remaining interest reserve as part of an ADC lending project, and assessing the appropriateness of the use of interest reserves during the entire term of the loan.[4]

Although the Financial Accounting Standards Board has not issued any standards focused specifically on the use of interest reserves from the lender's standpoint, longstanding accounting concepts that govern the recognition of income are applicable to interest reserves. Thus, in general, interest that has been added to the balance of a loan through the use of an interest reserve should not be recognized as income if its collectibility is not reasonably assured.[5] This accounting concept has been incorporated into the criteria for placing an asset in nonaccrual status for purposes of the Consolidated Reports of Condition and Income (Call Report). The Call Report instructions present these criteria in the general rule in the Glossary entry for "Nonaccrual Status," which provides in part that banks should not accrue interest on any asset for which payment in full of principal or interest is not expected.[6]

Overall, this accounting and reporting guidance represents a framework that ensures that regulatory reports accurately reflect the economic substance of a transaction, taking into consideration a key factor that bears on whether interest income is both realized (or realizable) and earned. For example, the accrual of uncollected interest and its capitalization into the loan balance (e.g., through the use of interest reserves) will not be appropriate when an ADC loan becomes troubled and the full collection of contractual principal and interest payments is no longer expected.

**Managing Potential Risks**

In addition to existing regulatory and accounting guidance, a number of risk management practices are being recommended during examinations of FDIC-insured institutions with ADC portfolios. Recommended risk management practices include the following:

- Establish loan policies and procedures that detail the circumstances and types of loans where interest reserves may be used, with limits on time and amount of such reserves, including situations involving renewals, extensions, and refinancing;

- Maintain effective and ongoing controls for monitoring compliance with loan covenants for the advancement of funds and determination of default conditions, such as receipt of zoning variances and entitlements, limits on construction starts, and delivery of qualified pre-sales;

- Periodically evaluate and monitor real estate market conditions by independently analyzing demand, supply, and price fluctuations for properties being developed;

- Periodically reexamine property appraisals and establish steps to ensure proper evaluation of collateral when material changes occur in the real estate market;

- Regularly obtain sufficient current financial statements on the borrowing entity and guarantors to perform a global cash-flow analysis and examine the potential pressures of other projects and financial commitments; and

- Maintain effective procedures for monitoring ADC projects to ensure that loan underwriting and oversight are appropriate in light of the project's status, the borrower's financial condition, and the collateral protection based on present market conditions.

In addition, banks should implement monitoring procedures to ensure that appropriate action is taken if and when "red flags" emerge. Each phase of an ADC loan carries with it particular vulnerabilities (as discussed below). The timely recognition of potential problems will help lenders ensure that the loan is appropriately administered and reported on its financial statements. Of particular importance is the lender's assessment of whether the use of an interest reserve remains appropriate given emerging risks or weaknesses in the ADC credit.

### Acquisition

When acquiring land, the borrower generally does not yet have approval to develop the property. During this period, a number of rezoning and permitting obstacles may arise that could significantly delay or never allow the proposed project to develop as intended.

Red Flags in the *Land Acquisition* stage typically involve delay, neglect, or failure by the borrower to:

- Perform engineering, environmental, and feasibility studies;

- Prepare preliminary site and architectural plans;

- Submit a formal application and filing fee to the appropriate planning and zoning commissions (municipal, county, state, and federal);

- Comply with mandatory meetings between the petitioner and planning and zoning commissions, as well as public hearings; and

- Obtain zoning variances and building permits.

### Development

After the property is acquired and necessary approvals are obtained, the land is developed for future construction of homes, commercial space, or other planned structures. During development, the lender must ensure that the borrower is using loan proceeds to convert the property into construction-ready building sites. Many factors can delay the scheduled start and completion of a real estate development project that could cause significant cost overruns and prevent the borrower's ability to procure permanent financing or inhibit ADC project sales or lease-up.

Red Flags in the *Development* stage typically involve the delay, suspension, or failure to perform property improvements involving:

- Subdividing, leveling, and grading;

- Building roads and right-of-way access;

- Laying of sewers, water pipes, and utility cables and connecting to municipal water and sewer systems;

- Acquiring zoning changes and securing state, local, and federal permits (environmental and construction); and

- Obtaining support from the various stakeholder groups or communities affected by the project.

### Construction

Once the property is developed, the proposed structure(s) are built. Potential risks that emerge during the construction period could determine whether the project will be completed on schedule and at the projected cost.

Another critical red flag that can occur during any phase of an ADC loan is a change in economic or real estate market conditions. Adverse changes in the economy or real estate markets can lower the purchase price and alter the timing of sales or leases (i.e., absorption rate) of the land or properties under development. In extreme cases, a serious downturn in market conditions can halt an ADC project whose cost to develop significantly exceeds the realizable value. These changes can materially affect the value of collateral, the borrower's cash flow, and his or her overall ability to repay the loan. As a result, lenders should diligently monitor economic and real estate market conditions and carefully assess the effect on an ADC loan to ensure that it is properly administered and reported on financial statements.

Red Flags in the *Construction* phase may arise for a number of reasons, including:

Each depositor insured to at least $250,000 per insured bank.   A Director and FDIC connect.   Required Financial Reports   Examiner Training Programs

- Borrower's failure to properly estimate costs for the entire project;
- Project management and ownership disagreements;
- Subcontractor failure;
- Diversion of construction or other project funds; and
- Vandalism and natural disasters (e.g., tornado).

## Conclusion

In instances where lenders see red flags or an ADC project actually becomes troubled, the lender should carefully evaluate the factors underlying the borrowing relationship—including the status of the project, the financial condition of the borrower and any guarantors, and the collateral protection in light of present market conditions. Lenders should then take the necessary steps to manage the emerging risks, as well as properly report the distressed ADC loan on their regulatory reports, including for purposes of interest income recognition and the determination of an appropriate level for the allowance for loan and lease losses.

As part of an ongoing review of the ADC project, the lender should evaluate the appropriateness of the overall administration and regulatory reporting of the loan, including the accrual of uncollected interest through an interest reserve. The ongoing accrual of uncollected interest should be pursued only when the facts and circumstances underlying the ADC loan continue to reasonably support the contractual payment of principal and interest.

**Santiago L. Granja**
*Bank Examiner*
*South Florida Field Territory*
*SGranja@fdic.gov*

**James W. Kroemer**
*Bank Examiner*
*Atlanta Field Office*
*JaKroemer@fdic.gov*

**John P. Henrie**
*Field Supervisor*
*Atlanta Field Office*
*JoHenrie@fdic.gov*

[1] Loan data obtained from Call Reports and Thrift Financial Reports submitted by FDIC-insured financial institutions.

[2] Noncurrent level for nonfarm, nonresidential loans was 0.81 percent, and the noncurrent level for multifamily residential real estate loans was 0.76 percent. Third Quarter 2007 *Quarterly Banking Profile*, Chart 7, "The Noncurrent Rate of Construction Loans Has Been Rising From Historic Lows," http://www2.fdic.gov/qbp/2007sep/chart7.html, and Fourth Quarter 2007 *Quarterly Banking Profile*, Table V-A, "Loan Performance, All FDIC Insured Institutions," http://www2.fdic.gov/qbp/2007dec/all5a2.html.

[3] FIL 22-2008, http://www.fdic.gov/news/news/financial/2008/fil08022.html.

[4] Neil B. Wedewer, *Best Practices in Lending to Homebuilders, RMA Journal* 89 (November 2006): 38–45.

[5] Comptroller of the Currency, *Guidelines for Capitalization of Interest on Loans,* Examining Circular (EC) 229, May 1, 1985, http://www.occ.treas.gov/ftp/ec/ec-229.txt.

[6] See Interagency Guidelines for Real Estate Lending Policies: 12 CFR 365 and appendix A (FDIC), http://www.fdic.gov/regulations/laws/rules/2000-8700.html#2000appendixatopart365; 12 CFR 34, subpart D and appendix A (OCC); 12 CFR 208, subpart E and appendix C (FRB); and 12 CFR 545 and 563 (OTS).

[7] FDIC Examination Modules, Construction, and Land Development Core Analysis Procedures, November 1997. Office of Thrift Supervision's *Examination Handbook,* Section 213, Asset Quality—Real Estate Lending Standards Rule, pp. 213.1–2, January 1994, http://www.ots.treas.gov/docs/4/422046.pdf. Federal Reserve Bank's *Commercial Bank Examination Manual,* Section 2100.1, Real Estate Construction Loans—Interest Reserves, November 1995, http://www.federalreserve.gov/boarddocs/SupManual/cbem/200705/0705cbem.pdf.

[8] See Accounting Research Bulletin No. 43, Chapter 1A, paragraph 1; Accounting Principles Board Opinion No. 10, paragraph 12; and Statement of Financial Accounting Concepts No. 5, paragraph 84(g).

[9] Instructions—Consolidated Reports of Condition and Income, Federal Financial Institutions Examination Council, Glossary, page A-59.

Table of Contents

Last Updated 05/30/2008                                                Supervisory Journal@fdic.gov

FDIC: Supervisory Insights - A Primer on the Use of Interest Reserves